[L. A. No. 18437. In Bank. Dec. 30, 1944.]

JAVIER BAUTISTA et al., Respondents, v. PAUL JONES et al., Appellants.

V. P. Lucas and John C. Stevenson for Appellants.

Ben Van Tress and James R. Jaffray for Respondents.

GIBSON, C. J.—Plaintiffs brought this action to enjoin defendants from coercing or preventing milk companies from supplying plaintiffs with milk or milk products. By stipulation the case was submitted on the pleadings and affidavits filed by the parties. Defendants have appealed from an order of the trial court awarding a permanent injunction.

Plaintiffs, Bautista and Macias, residents of California, were jointly engaged in the business of distributing milk and milk products to retail dealers in Los Angeles County for the

past seven or eight years. They purchased their milk and milk products from brokers or wholesalers and distributed it in automobile trucks which they owned and operated themselves. They employed no other persons and had no need for employees. They invested considerable sums of money for equipment and built up a business and a good will, realizing substantial yearly profits.

The defendant Milk Drivers and Dairy Employees Union, Local 93, is an unincorporated labor organization. It admits to membership "milk-wagon drivers, helpers and workers generally who are citizens of the United States." Defendant Paul Jones is the business agent and secretary-treasurer of Local No. 93. The union has "union shop" contracts with about ninety-five per cent of the milk brokers in Los Angeles County, and, according to the affidavit of the secretary-treasurer of the union, the companies signing the agreement have agreed that they will employ only union members in good standing. Thus, in practically the entire locality no one but union members may work *as employees.* The agreement also provides that the employers will not sell dairy products to any distributor unless he observes the same conditions of employment required of the employers.

The defendant union, having so organized the milk industry, proposed to plaintiffs that they employ members of Local No. 93 to drive their trucks. Plaintiffs declined to do so, but thereupon filed applications for admission to union membership. The applications were rejected by the union *"on the ground that plaintiffs were independent peddler distributors."* No other ground of rejection was mentioned.

Thereafter the union sent to each of the milk brokers with whom it had contracts the following communication:

"Dear Sir: For some time Local Union #93 has been confronted with the problem of the independent peddler distributors who have been from time to time taking business from the legitimate wage earners who are members of Local #93. At a regular meeting of Local #93 on October 23rd, there were a number of applications for membership filed by the independent peddler distributors which were discussed at some length by the members present at that meeting, after which they were rejected. The officers of Local #93 were instructed to see that the employers who held agreements with Local #93 comply with Paragraph 22 of our agreement on or

before November 30, 1941. As these men are not members of the Union and the membership does not see fit to admit them to Union membership, it seems there is only one way left, and that is to discontinue selling to these independent peddler distributors. Hoping you will cooperate in cleaning up this matter, Very truly yours, Paul D. Jones, Sec'y Treas.''

The trial court found that by the above notice and by oral statements the union demanded that the brokers cease delivering milk or milk products to plaintiffs, among other independent distributors, and that the brokers understood the notice to mean that if they continued to supply plaintiffs, the union would ''apply economic pressure to enforce such request and demand by means of strike, picketing and boycott.''

The court further found: ''That the purpose of said Local No. 93 and its agents was to prevent the plaintiffs from obtaining any milk or milk products with which to carry on their independent business of milk distributing to their retail customers, and *thereby to compel plaintiffs to employ as drivers of their trucks members of said Local No. 93, and to discontinue driving their own trucks and doing their own work of conducting their business with their own hands.*'' (Italics added.)

The brokers complied with the demands of the union, and plaintiffs, thus prevented from obtaining any milk or milk products, were compelled to discontinue their business. They brought this action for injunctive relief.

The trial court, concluding that the purpose of the union was unlawful and not reasonably related to legitimate activities of labor organizations, permanently enjoined the union and its agents and members from preventing plaintiffs from obtaining milk or milk products and from coercing brokers to refrain from selling such to plaintiffs. Defendants Local No. 93 and Paul Jones have appealed from the judgment, contending that the activities of the union, as found by the trial court, were not unlawful.

The case of *James* v. *Marinship Corp., ante,* page 721, [155 P.2d 329], furnishes the starting point for the consideration of the special problems presented herein. We held in that case that a union cannot maintain an arbitrarily closed union and a closed shop, and that therefore it cannot use economic pressure to compel the discharge of workers for lack of union membership when it arbitrarily excludes them from

membership. But we also reaffirmed the well-established rule that if the object of a union is reasonably related to the legitimate interests of labor, and the means employed are proper, the union cannot be enjoined from using concerted action to enforce its demands.

The right to work, either in employment or independent business, is fundamental and, no doubt, enjoys the protection of the personal liberty guarantee of the Fourteenth Amendment to the federal Constitution, as well as the more specific provisions of our state Constitution. (Cal. Const., art. I, §§ 1, 13; see *Suckow* v. *Alderson,* 182 Cal. 247 [187 P. 965]; *Angelopulos* v. *Bottorff,* 76 Cal.App. 621 [245 P. 447].) But this right, like others equally fundamental, is not absolute. It is safeguarded from legislative action which discriminates against a person or class of persons in respect of opportunities to obtain work or enter into business (*Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]; *Abe* v. *Fish & Game Commission,* 9 Cal.App.2d 300 [49 P.2d 608]); and it is also protected in some degree against arbitrary action by private organizations, including employers and labor unions. (*James* v. *Marinship Corp., supra.*) But it is subject to many legislative restrictions familiar to all, such as statutory limitations on working hours, minimum wages, age limits for employment, licensing acts, safety regulations, and a host of others. It is equally subject to peaceful, economic pressure by labor organizations seeking legitimate ends, such as conditions of work, collective rather than individual bargaining, seniority privileges and other methods of advancement, and the union or closed shop. (See *McKay* v. *Retail Auto. S. L. Union No. 1067,* 16 Cal.2d 311 [106 P.2d 373]; *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389 [106 P.2d 414]; *Shafer* v. *Registered Pharmacists Union,* 16 Cal.2d 379 [106 P.2d 403]; *American Federation of Labor* v. *Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855].)

The businessman-worker operating in an industry or field in which he competes with organized workmen may likewise be subjected to the same means of persuasion as any other workman to join the union and conform to the conditions regulating union labor. Directly in point is the decision of *Cafeteria Employees Union* v. *Angelos* (1943), 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58]. In that case plaintiffs owned and operated a cafeteria as partners, without aid

of any employees. The defendant labor union picketed the cafeteria "in an attempt to organize it." A New York court granted an injunction on the ground that there was no "labor dispute" within the meaning of the New York anti-injunction act. The United States Supreme Court reversed the judgment, stating (p. 126 [64 S.Ct.]): "But as we have heretofore decided, a state cannot exclude working men in a particular industry from putting their case to the public in a peaceful way 'by drawing the circle of economic competition so small as to contain only an employer and those directly employed by him.' *American Federation of Labor* v. *Swing*, 312 U.S. at 326. . . ." (*Cf. Bakery & P. Drivers Local* v. *Wohl*, 315 U.S. 769 [62 S.Ct. 816 [86 L.Ed. 1178].)

Some employers have sought to evade the obligations imposed by social security and similar legislation, enacted for the benefit and protection of employees, by inducing employees to sever their employment relationship and become independent distributors. The "peddler distributor system" and its asserted evils are described in *Bakery & P. Drivers Local* v. *Wohl*, 315 U.S. 769 [62 S.Ct. 816 [86 L.Ed. 1178], wherein the peddlers refused to join the union or to conform to its rules, such as a six-day week. It was held that the union's peaceful picketing could not be enjoined. In *Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916], the union published an article calling attention to the asserted violation of an agreement by the dairy owners through the hiring of nonunion drivers, some of whom had been union members and were persuaded to become independent contractors. It was held, that the union had a right to publish the facts concerning the existence of a bona fide labor controversy, and a judgment for damages for libel was reversed. And although the court was divided on the result all members were in agreement that the decisions of the United States Supreme Court establish the general proposition that the peddler distributor system, if deliberately introduced for the purpose of injuring the legitimate interests of organized labor, or if it operates with this effect, may be met with *appropriate* concerted action by the unions.

The instant case, however, is entirely distinguishable from those cases, in two vital respects: First, it is not a case of attempted introduction of the peddler system by employers as a means of lowering the union's conditions of work, since

both plaintiffs entered the business on their own initiative many years ago. Second, it is not a case of the peddler distributor attempting to compete with union workers on unequal terms, either for his own interests or those of the employer. The two plaintiffs sought to join the union, but were refused admission on the sole ground that they were "peddlers." The threat to picket, boycott, and strike was then made to prevent plaintiffs from continuing as businessmen-workers. Thus the question before us does not relate to the right of the union to take measures reasonably necessary to protect its members from unequal or unfair competition, but, instead, to the asserted right to make the possible evils of a *system* the basis for complete deprivation of the opportunity of particular individuals to work.

In dealing with a question of such gravity we must take notice of the far-reaching effect of any such decision as the union urges upon us. Milk is only one commodity distributed by retail delivery, and not all businesmen-workers are engaged in the retail distribution of commodities. The union's position would have an identical effect on the laundry and dry-cleaning driver, the barber and the plumber, the watchmaker and the groceryman, the service station operator, and the farmer. In a word, all businessmen-workers operating without the aid of employees will be affected by the result of this case, and a decision which dooms them to extinction at the hands of powerfully organized labor unions cannot be lightly made. Ironically, one of the goals toward which workingmen strive, namely, the greater security and opportunity of an independent business, is the subject of attack by the very group which may, in many instances, profit by it. Nor can the elimination of the small independent farmer from our economic life be contemplated without the most serious misgivings.

We think the true answer to this question will be found in the realization that the businessmen-workers constitute a minority group, whose activities are not fundamentally inimical to the public interest or to the special interest of organized labor, and who therefore are entitled to the same treatment as any other minority group. The elimination of such persons from our economic life is no more a legitimate object of union activity than would be the elimination of Negroes; and any union which exerts economic pressure to obtain the

discharge of the businessman-worker as such, and at the same time excludes him from union membership on that ground alone, transcends the bounds of legitimate union activity. (See *James* v. *Marinship Corp., ante,* p. 721, *supra.*).

The case of *Senn* v. *Tile Layers Protective Union,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229], is not inconsistent with this view. In that case the defendants sought to unionize plaintiff's employees, and to persuade plaintiff Senn to sign an agreement that all work should be done by union tile layers, which would have prevented Senn from doing any further work as a tile layer. The Wisconsin court denied Senn an injunction against peaceful picketing, and the United States Supreme Court, in affirming that judgment, held that it was a matter for the state to determine whether to permit unions to endeavor to induce an employer to agree to refrain from using his hands, and that ''Whether it was wise for the state to permit the unions to do so is a question of its public policy—— not our concern. The Fourteenth Amendment does not prohibit it.'' Thus the Senn case merely determines that there is *no absolute federal constitutional right* of an individual to work with his hands, and it declares that the legitimacy of the objects of union concerted action is a matter of state policy.

It is, of course, improper in this proceeding to consider what means the union may adopt to eliminate the alleged evils of the peddler distributor system. The record shows that nothing of this sort was attempted but, instead, the union flatly refused to accept plaintiffs into membership, and offered no terms upon which they would be permitted to work. This position of the union may be contrasted with numerous instances which our economic history discloses of businessmen-workers, including distributors of retail commodities and service drivers, who are members of labor unions and have worked in harmony with union employees. In the very opinions relied upon by defendants as establishing their right to concerted action against peddler distributors, it appears that efforts were made by the union to induce the peddlers to join or to comply with working hours or other conditions applicable to union members. (See *Bakery & P. Drivers Local* v. *Wohl,* 315 U.S. 769, *supra; Cafeteria Employees Union* v. *Angelos,* 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58] *supra; Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146, *supra.*)

Defendants assert that the inapplicability of social security and workmen's compensation laws gives to the peddler a special bargaining advantage with the employer by permitting him to work for a lower return. This may be true, but the problem thus presented must be solved without entirely eliminating businessmen-workers from the ranks of labor and industry. Insofar as unemployment insurance is concerned, plaintiffs would not come within the provisions of the law even if they were to hire one or two workmen, since the statutes apply only to employers who hire a greater number of employees. (Unemployment Insurance Act [Stats. 1935, p. 1226 as amended], Deering's Gen. Laws, Act 8780d, § 9; U.S.C.A., Title 26, Internal Revenue Code, § 1607.) If the applicability of unemployment insurance laws were the criterion, then labor would have the right to use its weapons to force the small merchant, the small barber and the corner grocer out of business because, since their trade does not warrant it, they cannot afford to hire enough employees to come within the terms of the statute. If it seems desirable to bring peddlers and others similarly situated within the purview of the laws relating to unemployment insurance and workmen's compensation, proposals to accomplish that end must be addressed to the Legislature or the voters.

The union may, of course, impose reasonable requirements for membership, and if the regulations adopted are proper the peddler must comply therewith or relinquish his favored position in order to avoid union pressure. If the peddler meets the conditions imposed, the union must accept him for membership or give up its demand for a closed shop. The interests of the peddler member may not be identical with the other union men, but the resultant conflicts and inequalities must be overcome if the legitimate objectives of organized labor are to be achieved and the means of attaining them preserved without arbitrarily depriving the small businessman who operates without the aid of employees of the right to work with his hands. The rights involved are too fundamental to be ignored by either group; they cannot be flouted but must be reconciled, regardless of the difficulties which may confront those faced with the task.

Defendants contend that the terms of the injunction are too broad, in that it restrained them from "preventing" plaintiffs from obtaining milk "in any manner or by any

means." This language was, of course, directed to conditions existing at the time of the decree. If the relationship of the parties is altered in such a manner as to justify a modification or vacation of the decree, application may be made therefor. (See *Milk Wagon Drivers Union* v. *Meadowmoor Dairies*, 312 U.S. 287, 298-299 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200].)

The judgment is affirmed.

Shenk, J., and Curtis, J., concurred.

EDMONDS, J.—Under the law of this state as it has developed in recent years, and particularly since the decision in *J. F. Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550], the intentional interference by union labor with the advantageous economic relations of others is not tortious provided the means used are peaceful and truthful and the object sought to be accomplished has reasonable relevance to labor conditions. And it has been held that the boycott, either primary or secondary, is a form of economic pressure which may be employed to accomplish any lawful purpose. (*McKay* v. *Retail Auto. S. L. Union No. 1067*, 16 Cal.2d 311 [106 P.2d 373]; *C. S. Smith Met. Market Co.* v. *Lyons*, 16 Cal.2d 389 [106 P.2d 414]; *Fortenbury* v. *Superior Court*, 16 Cal.2d 405 [106 P.2d 411].) But in the present case, the trial judge found that the purpose of the union and its agents was neither a lawful one nor was it related to the establishment of better wages, hours, or conditions of employment. I concur in the affirmance of the judgment giving effect to those conclusions because, as I read the record, the evidence compels the findings upon which the injunction was ordered, or taking the position most favorable to the appellants, the decision of the trial court rests upon conflicting evidence which places the determination beyond the reach of an appellate tribunal.

By the decisions of this court, the right of a labor organization to picket an employer or boycott a third person under certain specified conditions has been recognized as an exception to the general principles of tort law. In our present day highly industrialized society, both employers and organized labor invade the respective fields of operation of their competitors. Each group has economic interests, the inten-

tional invasion of which is prima facie tortious and is actionable unless privileged. But because competition is an essential element of private enterprise, this disregard of property rights has been held to be justified when the purpose is reasonably related to the economic interests of the invading group. More particularly, the proposition that a court should not intervene to aid one person in an economic struggle in which another has a substantial interest at stake and is employing lawful means is founded upon a weighing of the benefits obtained against the detriment to society and the person injured.

In applying these rules to cases involving labor controversies, it has become the settled law of this state that organized labor has the constitutional right, as an incident of free speech, to fully publicize the facts of a labor dispute and invite public support of its position. (*C. S. Smith Met. Market Co.* v. *Lyons, supra; McKay* v. *Retail Auto. S. L. Union No. 1067, supra.*) And in the exercise of its constitutional right of free speech, a union is privileged intentionally to induce others, in their relation with an employer, to apply economic pressure upon him resulting in injury. However, this privilege to interfere with a competitor's valuable and legally protected economic interests is not an absolute one, but is qualified and conditional.

The first limitation which has been applied by this court is that a union, in compelling compliance with its demands through the application of economic pressure, induced by publication of the facts and the solicitation of support, is privileged to invade the interests of others only where it employs peaceful and truthful means. (*Magill Bros.* v. *Building Service etc. Union,* 20 Cal.2d 506 [127 P.2d 542] ; *Steiner* v. *Long Beach Local No. 128,* 19 Cal.2d 676, 696 [123 P.2d 20] ; *C. S. Smith Met. Market Co.* v. *Lyons, supra; McKay* v. *Retail Auto. S. L. Union No. 1067, supra; J. F. Parkinson Co.* v. *Building Trades Council, supra.*) The second general condition necessary to justify the invasion of economic interest is that the end be lawful. "Any injury to a lawful business . . . is *prima facie* actionable, but may be defended upon the ground that it was merely the result of a lawful effort of the defendants to promote their own welfare." (*J. F. Parkinson Co.* v. *Building Trades Council, supra.*) The purpose of labor must be reasonably relevant to legitimate labor conditions and

the labor controversy one in which the union has "a substantial" and a "direct and obvious" interest. The activity of the workers, it has been said, must "benefit them directly" or "enhance their bargaining power"; for example, the concerted action must have the direct effect of and be reasonably relevant to "the attainment of higher wages, shorter hours of labor or better working conditions."

Considering the situation of the parties in the present case, the appellant union, in accordance with the general purpose of organized labor, has a direct and substantial interest in obtaining maximum wages, minimum hours, and better working conditions, and, in maintaining such advantageous labor conditions, once achieved, the workers may obtain closed shop contracts or devise any other means reasonably adapted to securing an advantageous bargaining position. On the other hand, a person has the right to own and control his own business, work in that business with his own hands, refuse to employ workers for whom he has no need, and to procure the merchandise or products without which the business could not operate. It is these conflicting economic interests which must be weighed in determining the respective rights of the parties.

By an affidavit of Jones, its business agent, the union stated in particular the basis for its position that the boycott against the respondents was for a lawful purpose. According to this affidavit the reasons for refusing to admit Bautista and Macias, and other persons termed "independent peddler distributors," to membership are economic and not personal, political, or national. Jones declared that companies engaged in industries where commodities sold at retail are delivered by automotive transportation have fostered and encouraged a form of retail delivery "variously known as 'independent peddlers', 'independent distributors', and 'venders', that said companies in distributing their products have encouraged this form of distributing and delivery for various economic reasons; among others, it eliminates the responsibility of the company for the payment of the Old Age and Un-employment Insurance tax and it eliminates the necessity of paying or carrying employers liability insurance and evades the responsibility imposed by the workmen's compensation, insurance and safety acts and further evades liability under the master and servant law; that as the result of the growth and development of this

system of 'independent peddler distributors' many union wage earners are deprived of the benefits of the social security laws, workmen's compensation laws, and various other beneficial legislation enacted for the benefit and progress and social welfare of the people of the State of California . . . these so-called 'independent peddler distributors' work long hours in excess of the hours fixed by the union for their membership and the said 'venders', otherwise fail to observe the reasonable rules and regulations established by the union for the betterment of working conditions. . . .''

It may be conceded that the dissatisfaction of organized labor with a system of distributing milk products which avoids minimum wages and hours, workmen's compensation and social security benefits is a legitimate matter of labor dispute (*Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146, 155 [143 P.2d 20, 150 A.L.R. 916]). But no such plan is shown in the present case. Here we have two men who were, in effect, retail merchants carrying on their business by their own efforts. The union does not claim that Bautista and Macias are now or have ever been directly or indirectly connected with the milk brokers from whom they were purchasing milk products at the time the boycott was instituted; on the contrary, it affirmatively appears that for some seven or eight years the respondents have carried on a milk distributing business, buying dairy products from various brokers. Nor is there any showing that either Challenge Creamery and Butter Association nor Associated Dairies, against whom the boycott was directed, has fostered or encouraged the sale of its products by independent vendors; indeed there is no evidence that these companies sold to such vendors other than Bautista and Macias.

This is a very different situation from that shown in the Emde case where it appeared without contradiction that the dairy, notwithstanding a contract with the union providing for the employment of its members exclusively as truck drivers, decided to change the method of operation and negotiated with the men then in its employ to distribute milk to the same customers under an agreement providing for compensation upon a percentage basis. By establishing the new arrangement for the delivery of its products, the dairy escaped compliance with the conditions imposed by union labor as to wages and working conditions. However, unless one sub-

scribes to the broad proposition that a retail merchant having no direct connection with the wholesaler from which he buys his goods, nor carrying on business by any subterfuge, must employ members of organized labor regardless of his need for them, then no lawful purpose has been shown in the present case.

True, organized labor, as a matter which is within the proper concern of every citizen, has an interest in the working conditions of all persons who are engaged in business and industry. Also, every proprietor of a business who performs some of the same tasks as those of his employees, even within the usual hours of a business day, takes from those within the employee group part of the work which could be done by them. But the legitimate interest of a labor union is to secure reasonable wages and working conditions for those who, as employees, contribute their energy and\skill to the industrial life of the community. A requirement that the proprietor of a business must restrict his working hours and conditions to the standards set by a union has no reasonable relevance to advantageous labor conditions unless organized labor is to have a monopoly on all useful work with no right of the owner to do more than provide the capital by which wages may be assured.

For these reasons the trial court was fully justified in finding that the purpose of the union and its agents "was not reasonably connected with any controversy which affects workers in the milk industry generally, or any workers employed by plaintiffs, nor was it reasonably related to employment or collective bargaining; that such purpose was essentially selfish and unreasonable and outside of and repugnant to the legitimate purposes and activities of labor unions in respect to improving the workers' condition as such; that such purpose and the results thereof subserved no public interest and was not for public welfare." There is substantial evidence to the effect that the boycott was instituted solely because Bautista and Macias were not American citizens, in addition to that relating to the conflicting economic interests which were required to be weighed in determining the respective rights of the parties.

The appellants rely not only upon the decisions of this court by which it was held that organized labor, under specified conditions, is privileged to apply economic pressure upon employers but assert that the conclusions of the Supreme

Court of the United States compel a reversal of the judgment in the present controversy. They call particular attention to *Cafeteria Employees Union* v. *Angelos,* 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58], and *Bakery & P. Drivers Local* v. *Wohl,* 315 U. S. 769 [62 S.Ct. 816, 86 L.Ed. 1178], in which the court struck down, as an abridgement of free speech, broad injunctions granted by New York courts prohibiting picketing of any nature against persons having no employees upon the ground that no "labor dispute" was involved within the meaning of the state statute.

Mr. Justice Brandeis, by dictum in *Senn* v. *Tile Layers Protective Union,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229], for the first time suggested that the right of labor to picket peacefully was an incident of free speech under the Fourteenth Amendment to the federal Constitution. Senn's complaint charged that the unions had picketed his place of business and also had sent letters to architects and contractors requesting them not to patronize him because he was conducting a nonunion shop and threatening to picket them if they did so. Through counsel the unions agreed that they would not send any other communications of that kind nor would they resort to picketing. Most significantly, the United States Supreme Court emphasized in its statement of the facts of the case that the trial judge treated this agreement as disposing of the claim for relief on account of the boycott. For that reason, it was said, the union's acts in regard to a boycott were not material.

Considering the facts upon which the case was decided, it appears that Senn, the proprietor of a small business, and also his employees, declined to join the tile layers' union. When he refused to sign a contract which barred him from working at his trade with his employees the union peacefully picketed the place of business. Denied an injunction under a Wisconsin statute allowing labor to use that form of economic pressure, upon certiorari to the Supreme Court he contended that the statute abridged his right under the Fourteenth Amendment to the United States Constitution to work under conditions of his own choice. In affirming the judgment, Mr. Justice Brandeis, speaking for the court, observed: "The question for our determination is whether either the means or the end sought is forbidden by the Federal Constitution. Clearly the means which the statute authorizes—picketing and peace-

ful publicity—are not prohibited by the Fourteenth Amendment. . . . The picketing was peaceful. The publicity did not involve a misrepresentation of fact. . . . The end sought by the unions is not unconstitutional.'' This conclusion was based upon the finding that the union had legitimate interests to protect and that Senn's action was in conflict with those interests. Succinctly summarizing the basis for the decision, it was held: ''The laws of Wisconsin, as declared by its highest court, permit unions to endeavor to induce an employer, when unionizing his shop, to agree to refrain from working in his business with his own hands—so to endeavor although none of his employees is a member of a union. Whether it was wise for the state to permit the unions to do so is a question of its public policy—not our concern. The Fourteenth Amendment does not prohibit it.''

Unlike the present case, Senn was an employer and the union peacefully picketed his place of business after abandoning its secondary boycott. But there is a more fundamental distinction between the situation of Senn and that of Bautista and Macias in the present case, for the United States Supreme Court merely decided that the Wisconsin Labor Code violated no constitutional principle because the Fourteenth Amendment does not guarantee the right of injunction against peaceful picketing. In this connection, the court held that it was not concerned with the wisdom of the public policy of Wisconsin. The Senn case therefore is not authority for the proposition that an injunction prohibiting the application of economic pressure against a person carrying on a business entirely by his own efforts violates constitutional guarantees of free speech. On the contrary, the decision is consistent with the California cases which restrict organized labor's privilege intentionally to injure its competitors. More particularly, the federal court held that this privilege did not stem from the provisions of the Wisconsin Labor Code, declaring: ''Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.''

Nor are *Carlson* v. *California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104], and *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093], determinative of the present controversy. These cases concerned an Alabama statute and a

county ordinance of California, respectively. Each enactment, which prohibited picketing in any form, was challenged as a denial of the right of free speech under the Fourteenth Amendment to the Constitution. The court held both statutes unconstitutional. In the Thornhill case, the court pointed out that the legislation against picketing "leaves room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and the accurateness of the terminology used in notifying the public of the facts of the dispute." The court pointed out that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution," and condemned the Alabama law because "whatever the means used to publicize the facts of a labor dispute, . . . all such activity without exception is within the inclusive prohibition of the statute. . . ." But the court recognized, in general terms, that a state was not required to permit picketing under all circumstances. In the Carlson case because of the "sweeping and inexact" terms of the ordinance, it was held to be violative of constitutional rights.

Picketing was again justified upon the ground of the guarantee of free speech in the case of *American Fed. of Labor* v. *Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855]. In that case, the state court enjoined the union from peacefully picketing a beauty parlor in an endeavor to unionize it upon the ground that the proprietor had no dispute with his employees and none of the members of the picketing union had ever been employed by Swing. In reversing the decree, the Supreme Court declared: "A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing a circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him." But neither of these decisions presents any constitutional obstacle to the injunction against the appellant union in this case, for they stand only for the proposition that organized labor has the constitutional right, as an incident of free speech, to peacefully picket employers, including those with whom the union membership had no prior employment relation. And, it should be noted, the court employed general language in announcing the rule.

Certainly, the court did not declare, and according to subsequent decisions it did not hold, that the rule announced was not without exceptions, whereunder state courts might properly enjoin "even peaceful picketing." (*Bakery & P. Drivers Local* v. *Wohl, supra.*)

In *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200], a general limitation was placed upon the doctrine of the Thornhill and Carlson cases. The court was there concerned with "acts in themselves peaceful" but "enmeshed with contemporaneously violent conduct." In holding that the state court violated no constitutional principle, by enjoining the union from all picketing, Mr. Justice Frankfurter declared: "But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution. . . . The Fourteenth Amendment still leaves the state ample discretion in dealing with manifestations of force in the settlement of industrial conflicts. . . . But these liberties [freedom of speech and press] will not be advanced or even maintained by denying to the states with all their resources, including the instrumentality of their courts, the power to deal with coercion due to extensive violence." Although the decision, by necessity, was placed upon the ground of the constitutional guarantee of free speech, the same result would be reached by applying the rule long recognized in this state, that picketing conducted with violence is an unlawful means for exerting economic pressure. By the Meadowmoor decision, the Supreme Court plainly declared that, in enjoining what this court has said was unlawful picketing (*Steiner* v. *Long Beach Local No. 128, supra; Magill Bros.* v. *Building Service etc. Union, supra*), there is no violation of the federal Constitution. Moreover, implicit in the decision of *Allen-Bradley Local No. 1111* v. *Wisconsin Employment Relation Board,* 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154], is the further limitation that a state may reasonably restrict the place where picketing is carried on, for there the state court had enjoined, among other things, picketing in front of an employee's home.

Concurrently with the Allen-Bradley case, the court again sustained the right of a state to regulate labor disputes. In *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U.S. 722

[62 S.Ct. 807, 86 L.Ed. 1143], because Ritter engaged an independent contractor, who did not employ union labor, to build a structure, the carpenters' union peacefully picketed his cafe, located a mile and one-half from the place of the construction work. The union also induced Ritter's cafeteria employees, with whom he had no labor dispute, to strike. The picketing was enjoined under the Texas antitrust law. In sustaining the power of the state court to do so, Mr. Justice Frankfurter, speaking for the court, said: ''The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both.

''The task of mediating between these competing interests has, until recently, been left largely to judicial lawmaking and not to legislation. . . . The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted.

''But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain.

''Texas has undertaken to localize industrial conflict by prohibiting the exertion of concerted pressure directed at the business, wholly outside the economic context of the real dispute, of a person whose relation to the dispute arises from his business dealings with one of the disputants. The state has not attempted to outlaw whatever psychological pressure may be involved in the mere communication by an individual of the facts relating to his differences with another.

''It is true that by peaceful picketing workingmen communi-

cate their grievances. As a means of communicating the facts of a labor dispute peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication.

"In forbidding such conscription of neutrals, in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the states."

Conforming to the doctrine of these decisions is the case of *Bakery & P. Drivers Local* v. *Wohl, supra,* wherein the trial court enjoined peaceful "secondary picketing" for the sole reason that no "labor dispute" was involved, within the meaning of the New York statutes. Upon appeal, the ruling was affirmed without written opinion. In this connection, the Supreme Court called attention to the fact that in each of these cases, "So far as we can ascertain from the opinions delivered by the state courts . . ., those courts were concerned only with the question whether there was involved a labor dispute within the meaning of the New York statutes. . . ." In condemning the manner in which the courts enjoined peaceful picketing, the Supreme Court declared that "one need not be in a 'labor dispute' as defined by state law to have the right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive." Although conceding, in the Wohl case, that "A state is not required to tolerate in all places and all circumstances even peaceful picketing," New York's attitude was assailed because "there are no findings and no circumstances from which we can draw the inference that the publication was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive. . . ." In the Wohl case, apparently in response to the assertion that the Court of Appeals of New York subsequently disclosed its basis for affirming the decree of the trial court, the Supreme Court observed: "The respondents say that the basis for the decision below was revealed in a subsequent opinion of the Court of Appeals, where it was said with regard to the present case that 'we held that it was

an unlawful labor objective to attempt to coerce a peddler employing no employees in his business and making approximately thirty-two dollars a week to hire an employee at nine dollars a day for one day a week.' *Opera on Tour v. Weber*, 285 N.Y. 348 [34 N.E.2d 349, 136 A.L.R. 267], writ of certiorari denied in 314 U.S. 615 [62 S.Ct. 96, 86 L.Ed. 495]. But this lacks the deliberateness and formality of a certification, and was uttered in a case where the question of the existence of a right to free speech under the Fourteenth Amendment was neither raised or considered.'' From this it may be concluded that if the basis for the decision in the Wohl case had been clearly stated by the New York court, the United States Supreme Court might well have reached a different conclusion.

In *Opera on Tour* v. *Weber, supra,* because an employer refused to hire musicians to take the place of mechanical music, although no dispute existed between plaintiff and such employees, the musicians' union ''ordered and coerced'' members of the stagehands' union ''to leave the employ of the plaintiff, causing ruin of the plaintiff's business.'' The musicians' union was enjoined from inducing the members of the stagehands' union from striking, upon the ground that their conduct amounted to an unlawful secondary boycott, instigated for an unlawful purpose. In affirming the judgment, the Court of Appeals made clear the fact that it did not consider that the boycott had ''any reasonable connection with wages, hours of employment, health, safety, the right of collective bargaining, or any other condition of employment. . . .'' Upon certiorari to the Supreme Court of the United States, the court denied the petition because ''It does not appear from the record that the federal question presented by the petition was necessarily decided by the Court of Appeals.'' (*Opera on Tour* v. *Weber, supra;* rehearing denied, 314 U.S. 716 [62 S.Ct. 477, 86 L.Ed. 570].) The implication justified from the denial, by the Supreme Court, of certiorari in that case compels the conclusion that the remedy invoked by Bautista and Macias violates no federal constitutional guarantee.

And it should also be noted that the issue in the present case is vastly different from the one determined by the Wohl decision in that the Supreme Court was there limited to deciding whether picketing could be enjoined for lack of a ''labor dispute.'' The facts of the two cases are so different as to

present other grounds for distinction. Although Wohl was engaged, much the same as Bautista, as an independent distributor of bakery products, he was part of a system fostered and encouraged by bakers in New York City. As stated by Mr. Justice Jackson, within five years, due to the passage of the social security and unemployment compensation laws, the number of independents increased from an insignificant number to more than 500. And, during the eighteen months preceding Wohl's suit, employers had been forcing great numbers of union drivers, under the threat of dismissal, to quit the employment relation and continue thereafter in an independent capacity.

No such facts were shown in the present case. To the contrary, Bautista and his associate had been engaged independently in distributing milk for some seven years and it does not appear that either ever had been employed as a milk truck driver. Nor does it appear here that, as in the Wohl case, there were "the aggressive inroads of this kind of competition upon the employment and living standards of" union members.

In *Cafeteria Employees Union* v. *Angelos, supra,* the union peacefully picketed a small cafe which was operated by several copartners with no employees. The New York Court of Appeals affirmed a decree enjoining the union on the ground that there was no "labor dispute" within the meaning of the statutes. In reversing the New York court, the Supreme Court, citing the Swing and Wohl cases, declared that workers may "state their cases and appeal for public support in an orderly and peaceful manner regardless of the area of immunity as defined by state policy." But it should be noted, the economic pressure applied by the union was picketing, and not a secondary boycott.

Certainly the decisions of the Supreme Court do not compel this court to permit a union to seek an unlawful objective, having no reasonable relation to working conditions or bargaining power. All that the Supreme Court has decided is that peaceful picketing, being an incident of freedom of speech guaranteed under the Fourteenth Amendment, cannot be blanketly enjoined by state courts, or arbitrarily prohibited or limited under all circumstances by legislative definition. Moreover, the Angelos case concerns different, although related, principles. A secondary boycott involves much more than persuasion, for it consists of the threat that economic

pressure will be applied upon the third person, having no dispute with either of the principals to the controversy, unless he joins in the attack upon the one from whom union labor is endeavoring to obtain certain action deemed desirable.

SCHAUER, J.—I dissent. In this suit the trial court, sitting without a jury, rendered judgment in favor of plaintiffs whereby it was "ORDERED, ADJUDGED AND DECREED that the defendant Milk Drivers and Dairy Employees Union, Local No. 93, and the agents, employees and members of said Union, and the said defendant Paul Jones, be and they are hereby permanently restrained and enjoined from preventing plaintiffs from obtaining milk or milk products from brokers or those who supply and sell such milk and milk products, and from coercing milk brokers from selling to plaintiffs and supplying plaintiffs with such milk and milk products in any manner or by any means. . . ." Defendants contend that they have neither done nor threatened to do any act which would entitle plaintiffs to the injunctive relief so granted. I am of the opinion that defendants' position is well taken.

The material facts are not in dispute. As found by the trial court, upon the pleadings and affidavit evidence, they are as follows: For some seven or eight years prior to the commencement (on December 31, 1941) of this suit plaintiffs had been jointly engaged in the business of distributing milk and milk products in Los Angeles County to retail dealers. Plaintiffs performed all of their own labor, purchasing their milk and milk products from brokers or wholesalers and making delivery to the retail customers in two automotive trucks which plaintiffs owned and individually operated. The appealing defendants are a labor organization known as the Milk Drivers and Dairy Employees Union, Local No. 93, and Paul Jones, its secretary-treasurer. The union membership consists of milk-wagon drivers and helpers and workers generally who are engaged in the milk and dairy business and in the handling of by-products of milk.

Defendant union had entered into union shop contracts with about ninety-five per cent of the milk brokers and wholesalers in Los Angeles County whose business was the selling of milk and milk products to distributors, among whom were plaintiffs. Paragraph 22 of the union shop contracts reads as follows: "Employer agrees that it will not sell dairy

products at its platform to any person, firm or corporation licensed by the California Department of Agriculture as a milk distributor unless such distributor observes and causes its employees to observe the same conditions of employment as those observed by employer.''

Prior to October 23, 1941, the union proposed to plaintiffs that the latter employ members of the union to drive plaintiffs' trucks. Plaintiffs declined, preferring to continue driving their own trucks, but did apply for admission to membership in defendant union. On October 23, 1941, plaintiffs' applications were rejected by the union on the ground that ''plaintiffs were independent peddler distributors,'' and on November 21, 1941, the union sent to each of the milk brokers and wholesalers with whom it had contracts, a letter reading (aside from the date and salutation) as follows:

''For some time Local Union #93 has been confronted with the problem of the independent peddler distributors who have been from time to time taking business from the legitimate wage earners who are members of Local #93.

''At a regular meeting of Local #93 on October 23rd, there were a number of applications for membership filed by the independent peddler distributors which were discussed at some length by the members present at that meeting, after which they were rejected. ·

''The officers of Local #93 were instructed to see that the employers who held agreements with Local #93 comply with Paragraph 22 of our agreement on or before November 30, 1941.

''As these men are not members of the Union and the membership does not see fit to admit them to Union membership, it seems there is only one way left, and that is to discontinue selling to these independent peddler distributors.

''Hoping you will cooperate in cleaning up this matter,

Very truly yours,

PAUL D. JONES, Sec'y Treas.''

The trial court found further ''That by the said notice and by oral suggestions and statements said Local No. 93 and its officers required and demanded of said brokers that they cease to deliver any milk or milk products to the plaintiffs, among other independent distributors; that the said brokers understood said notice to mean that in the event they continued to

supply milk and milk products to the plaintiffs, the said Local No. 93 would apply economic pressure to enforce such request and demand by means of strike, picketing and boycott.

"That as a direct result of said notice and communications all the brokers in Los Angeles County complied with the request and demand of said notice, and after December 14, 1941 refused to sell or furnish or deliver to plaintiffs any milk or milk products, and that since that date the plaintiffs have been prevented from securing any milk or milk products and have been compelled to discontinue their business, to their great and irreparable damage.

"That the purpose of said Local No. 93 and its agents was to prevent the plaintiffs from obtaining any milk or milk products with which to carry on their independent business of milk distributing to their retail customers, and thereby to compel plaintiffs to employ as drivers of their trucks members of said Local No. 93, and to discontinue driving their own trucks and doing their own work of conducting their business with their own hands.

"That said purpose was not related to the establishment of better wages, hours or conditions of employment in plaintiffs' business, as the plaintiffs had no employees and had no need for any employees; that the real purpose of defendant Local No. 93 and its agents was not reasonably connected with any controversy which affects workers in the milk industry generally, or any workers employed by plaintiffs, nor was it reasonably related to employment or collective bargaining; that such purpose was essentially selfish and unreasonable and outside of and repugnant to the legitimate purposes and activities of labor unions in respect to improving the workers' condition as such; that such purpose and the results thereof subserved no public interest and was not for public welfare.

"That unless restrained by the Court the defendant Union Local No. 93 and its officers and agents will continue by peaceful persuasion and through economic coercion to deprive plaintiffs of their right to purchase milk and milk products from the milk distributing brokers in Los Angeles County, and thereby deprive plaintiffs of their right to work as independent milk distributors for a living for themselves and their families."

Nevertheless, the right of the union to peacefully induce, or endeavor to persuade, other persons to cease doing business

with plaintiffs unless plaintiffs complied with not unlawful union demands, has been decisively established by decisions of both this court and the Supreme Court of the United States. See *Emde* v. *San Joaquin County etc. Council* (1943), 23 Cal. 2d 146, 155 [143 P.2d. 20, 150 A.L.R. 916] ; *American Fed. of Labor* v. *Swing* (1941), 312 U.S. 321, 325 [61 S.Ct. 568, 570, 85 L.Ed. 855, 857] ; *Bakery & P. Drivers Local* v. *Wohl* (1942), 315 U.S. 769, 774-775 [62 S.Ct. 816, 818-819, 86 L.Ed. 1178, 1183] ; *Cafeteria Employees Union* v. *Angelos* (1943), 320 U.S. 293 [64 S.Ct. 126, 127, 88 L.Ed. 58].

The so-called finding that the purpose of defendants was "outside of and repugnant to the legitimate purposes and activities of labor unions in respect to improving the workers' condition as such; that such purpose and the results thereof subserved no public interest and was not for public welfare," is at least in part a conclusion of law rather than of fact. In the Emde case, *supra* (decided since this case was tried), this court expressly held (23 Cal.2d at p. 155) that "it may not be denied that . . . the dissatisfaction of organized labor with a system of distributing milk products which avoids minimum wages and hours, workmen's compensation and social security benefits, is a legitimate matter of labor dispute. [Citations.] Therefore, the union, and those directly interested in and connected with the labor cause, had the right to urge the public and, of course, the members of organized labor, to refrain from buying the dairy's products unless the dairy abandoned the system of distribution which it had undertaken and rehired union drivers in accordance with the terms of the existing contract, whether or not the employer-employee relation then existed between the members of the union and the dairy. [Citations.]"

And in *Bakery & P. Drivers Local* v. *Wohl* (1942), *supra,* 315 U.S. 769 [62 S.Ct. 816, 86 L.Ed. 1178], the Supreme Court of the United States held that to enjoin a labor union from peacefully picketing independent or "peddler" distributors of bakery products, who performed all their own work and had no employees, for the purpose of securing employment for union members, was to unconstitutionally infringe upon the right of free speech guaranteed by the federal Constitution. The same principle was reaffirmed in *Cafeteria Employees Union* v. *Angelos* (1943), *supra,* 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58].

The opinion of Mr. Chief Justice Gibson, although recognizing (pp. 748, 749) that "The right to work, either in employment or independent business . . . is subject to many legislative restrictions familiar to all, such as *statutory* [italics added] limitations on working hours, minimum wages, age limits for employment, licensing acts, safety regulations, and a host of others . . . [and] to peaceful, economic pressure by labor organizations seeking legitimate ends, such as conditions of work, collective rather than individual bargaining, seniority privileges and other methods of advancement, and the union or closed shop," attempts to justify the injunction on the claim that plaintiffs are being completely deprived (see pp. 751, 752) of an inalienable right to work for themselves and earn a living. Actually the plaintiffs are the operators of an independent business and are simply being subjected to the vicissitous competition of free enterprise. Obviously plaintiffs are not deprived of the right to work or earn their living merely because in conducting their particular business they are faced with the practical alternative of employing union labor, of choosing another business in which to engage, or of continuing in the same line of work but in the employee status of union workers, rather than as independent peddlers. The situation of plaintiffs here is manifestly distinguishable from that of the Negro plaintiff and his coworkers of the same race in *James* v. *Marinship Corp.* (1944), *ante*, p. 721 [155 P.2d 329]. In that case the Negro workers were arbitrarily excluded from full union membership because of their color—an inherent attribute which they are powerless to alter, even should they wish to do so, and one which bears no reasonable relevancy to maintenance or advancement of the interests of labor generally—while here plaintiffs were denied union membership on the sole ground that they "were independent peddler distributors," i. e., were engaged in a type of activity which justifiably may be considered by labor as a whole as inimical to its own economic interests. There is no claim and no suggestion that if plaintiffs had ceased their independent peddling of milk and applied for union membership on the same basis as other members they would not have been admitted and accorded opportunities for both employment and a voice in union affairs equal to those of other members. The union was not arbitrarily or flatly closed to plaintiffs as was done in the James case and in certain other cases therein cited (such as

*Wilson* v. *Newspaper & Mail Deliverers' Union* (1938), 123 N.J.Eq. 347 [197 A. 720]; *Dorrington* v. *Manning* (1939), 135 Pa.Super. 194 [4 A.2d 886]; *Carroll* v. *Local No. 269* (1943), 133 N.J.Eq. 144 [31 A.2d 223, 225], and *Cameron* v. *International Alliance of Theatrical Stage Employees* (1935), 118 N.J.Eq. 11 [176 A. 692, 701, 97 A.L.R. 594]), and certainly it is not for this court to assume to determine the wisdom, either with respect to union labor or with respect to the public as a whole, of the policy here adopted by the union of refusing membership to independent businessmen-workers, or to base its decision in this case upon such a determination. Such businessmen, even if they should prefer as did plaintiffs here to perform their own work so far as able, are at least in the status of capitalist-employers, and therefore the accepted and traditional opponents of labor as a whole, and we cannot justifiably pronounce that unions must either admit to membership such opponents or else refrain from taking economic measures against them.

In the James case it is stated (p. 736) that "Defendants argue that a union should not be compelled to admit all persons to membership, because some of such persons may have interests inimical to the union and may destroy it from within. The right of the union to reject or expel persons who refuse to abide by any reasonable regulation or lawful policy adopted by the union *(Brown* v. *Lehman* (1940), 141 Pa. Super. 467 [15 A.2d 513], *supra;* see Rest. Torts, comment b to § 810) affords it an effective remedy against such persons." The general proposition that a union may reject or expel persons who refuse to abide by any *reasonable regulation* or *lawful policy* adopted by the union may be conceded. Again, however, it is not for this court to determine that a union regulation or policy that its members must be, or potentially occupy the status of, employees and not independent businessmen is either unreasonable or unlawful. Nor would the authorities relied upon in the above quotation from the James case support such a determination. *Brown* v. *Lehman* had to do with the expulsion of a union member for nonpayment of dues, and comment b to section 810 of the Restatement of Torts reads, in its entirety, as follows: "If the union is open to the employee on reasonable terms and he refuses to be a member of it, no cause of action accrues to him from the loss of his job. Whether the terms are reasonable is a question of fact in each

case. They may be unreasonable because they require him to pay an initiation fee which is unduly high in proportion to earnings in the industry, or because the initiation fee is unreasonably higher for him than for others. On the other hand, it is not unreasonable for a labor union to set standards of proficiency for its members and to require applicants for membership to conform to these standards. *Nor is it unreasonable for it to refuse to retain as a member one who engages in activities antagonistic to it* or is a member of a rival organization. Again, it is not unreasonable for the union to distribute available work among its members when it is scarce or to provide that the senior members of the union have a preference in taking jobs as they appear.'' (Italics added.) None of the depicted ''unreasonable'' situations exists here.

The opinion of Chief Justice Gibson (p. 750) asserts that ''the decisions of the United States Supreme Court establish the general proposition that the peddler distributor system, *if* [italics added] deliberately introduced for the purpose of injuring the legitimate interests of organized labor, or if it operates with this effect, may be met with *appropriate* concerted action by the unions,'' and then attempts to distinguish the instant case on the grounds that ''First, it is not a case of attempted introduction of the peddler system by employers as a means of lowering the union's conditions of work, since both plaintiffs entered the business on their own initiative many years ago. Second, it is not a case of the peddler distributor attempting to compete with union workers on unequal terms, either for his own interests or those of the employer. The two plaintiffs sought to join the union, but were refused admission on the sole ground that they were 'peddlers.' '' No such limited propositions, general or otherwise, are pronounced by the mentioned decisions. In each of them it was decided merely that upon its particular facts labor had done nothing unlawful and might not be enjoined from continuing its picketing, publishing, etc. And, again, it is not the province of this court to declare that the action taken by the union here was not ''appropriate.'' Also, as discussed above, the fact, stated in Chief Justice Gibson's opinion, that the denial of union membership to plaintiffs was on the sole ground that they were ''peddlers'' patently left the door open to them to join if they would assume the same status as other mem-

bers, namely, that of employees. It seems obvious that the plaintiffs here, by insisting upon continuing their activities as peddlers, were actually competing with union workers on unequal terms and under conditions which the union not unjustifiably considered to be obnoxious to its legitimate objects.

Nor it does it appear that, as suggested by Chief Justice Gibson's opinion (p. 751), a decision contrary to that reached by such decision will "doom to extinction" all "businessmen-workers," including barbers, plumbers, farmers, etc. Such an aim has been neither expressed nor manifested by the unions. The facts involved here, as to character of vocation, are basically different from those of the examples mentioned. A barber and a plumber engage primarily in selling their own personal skilled services; a farmer engages primarily in raising products from his land and selling them. But these plaintiffs are primarily conducting a business, buying and selling goods for a profit. If and when a program of the type suggested by the Chief Justice becomes apparent, it may and should be fully dealt with by the legislative arm of the government—not piecemeal by the courts. If, in the absence of such legislation, a case should arise presenting a problem of that type the occasion will be sufficient unto itself for consideration and determination of the powers and duties of the court in the premises. Moreover, the fact that, as also noted in the opinion of Chief Justice Gibson, the suggested program, if pursued, would place an additional hazard in the path of those union members who may hope to ultimately become independent businessmen, raises primarily a problem of internal union policy, or of outside legislative action; and this court may not with propriety paternally advise unions concerning the policies we may consider might be most advantageous to certain of their members. It would be only in the event of a clear showing of unlawful invasion of private rights or public policy that the courts should interfere.

Chief Justice Gibson's opinion next declares (p. 753) that although it "may be true . . . [that] the inapplicability of social security and workmen's compensation laws gives to the peddler a special bargaining advantage with the *employer* [italics added] by permitting him to work for a lower return . . . the problem thus presented must be solved without entirely eliminating businessmen-workers from the ranks of labor and industry. Insofar as unemployment insur-

ance is concerned, plaintiffs would not come within the provisions of the law even if they were to hire one or two workmen, since the statutes apply only to employers who hire a greater number of employees. [Citations.] If the applicability of unemployment insurance were the criterion, then labor would have the right to use its weapons to force the small merchant, the small barber and the corner grocer out of business because, since their trade does not warrant it, they cannot afford to hire enough employees to come within the terms of the statute. If it seems desirable to bring peddlers and others similarly situated within the purview of the laws relating to unemployment insurance and workmen's compensation, proposals to accomplish that end must be addressed to the Legislature or the voters. The union may, of course, impose reasonable requirements for membership, and if the regulations adopted are proper the peddler must comply therewith or relinquish his favored position in order to avoid union pressure. If the peddler meets the conditions imposed, the union must accept him for membership or give up its demand for a closed shop. The interests of the peddler member may not be identical with the other union men, but the resultant conflicts and inequalities must be overcome if the legitimate objectives of organized labor are to be achieved and the means of attaining them preserved without arbitrarily depriving the small business man who operates without the aid of employees of the right to work with his hands."

First, it may be noted that even though unemployment insurance does not apply to employers with less than four employees (Deering's Gen. Laws, 1937, p. 4125, Act 8780d, § 9), every individual who pays salary to even a single worker within the covered employments of the Federal Insurance Contribution Act (26 U.S.C.A., §§ 1400, 1410, Int. Rev. Code), more popularly known as the Old Age Insurance or Pension Law, is required (as also is the employee by means of withholding by the employer) to contribute to the fund provided by such act a sum now fixed at one per cent of the salary paid. And workmen's compensation insurance, also, applies to those having only one employee. (Cal. Lab. Code, div. IV.)

Second, it may not properly be said that a "peddler," otherwise termed an 'independent businessman-worker," has an "employer." He is ordinarily free to secure his merchandise

from such sources as he may deem most advantageous to himself and to dispose of it where, when, to whom, and at such profit to himself as his good business sense dictates. I am at a loss to understand what "reasonable requirements" a union could adopt to the end that "conflicts and inequalities be overcome" as between "peddlers" and employee union members. Is the union to require of peddlers who seek admission to its rolls that they charge higher prices (thus attempting to enter the price-fixing field), and with their anticipated increased profits purchase for themselves accident insurance, a retirement annuity, and (if available) unemployment insurance (thus to some degree paralleling the advantages of social security and workmen's compensation)? Or is it to charge higher dues from peddler members and undertake to itself furnish for them such benefits? A fertile imagination given free play could offer legion suggestions in this field, but by what standard is the union to determine their "reasonableness"? Would not a peddler or independent businessman of whom such requirements were made by the union complain, as did the plaintiff and his coworkers in the James case, that he was being discriminated against by the union in not being accorded membership on the same basis as other members? I think that Chief Justice Gibson suggests the answer to these problems and the thought which should control our decision in this case, in the following language: "If it seems desirable to bring peddlers and others similarly situated within the purview of the laws relating to social security and workmen's compensation, proposals to accomplish that end must be addressed to the Legislature or the voters." It seems to me that the whole problem presented by this case is one for legislative control, if any, and I fear that the decision set forth in the opinion of Chief Justice Gibson will tend more toward confusion and litigation than otherwise in the meantime.

Still another problem is apparent. If the unions are to be forced to admit to membership independent businessmen, or else refrain from effectively interfering with the latter's businesses, then the path will be open for the breaking down of the higher wage scale and other advantages for working men which the unions have succeeded in gaining in recent years. During the present war era jobs are plentiful. However, if during periods of less widespread employment, unemployed union members wish to enter the peddler field (or if pressure

is brought on employed members to force them to enter it, as was done in the Emde case), by what means could the union, if it is prohibited from expelling them, or else from shutting off their markets or their sources of supply, effectively prevent producers or wholesalers from dealing with such peddlers, and from thus in turn forcing other union members out of employment and into the peddler field with its uncertain and hazardous income levels and its lack of the social benefits enjoyed by regularly employed workers?

Furthermore, for this court to hold that the unions must admit peddlers or independent businessmen (or else take no economic measures against them) without requiring that they give up their independent position or make such other changes in their methods of doing business as the union may reasonably demand, would tacitly amount to holding that although a union may peacefully strive to secure a closed shop, it must, if successful, accept as members the employees of such closed shop *at whatever salary or other working conditions such employees may be satisfied to accept,* regardless of union standards. Such an explicit holding would, of course, never be suggested.

A further reason for not requiring that unions must as an alternative to invoking economic sanctions against peddlers admit them to membership, lies in the universally accepted and understood purpose and *raison d'etre* of labor unions: the maintenance and enhancement of favorable conditions (including, of course, wages) for working men as a class. That purpose may also be clearly discerned in the efforts of labor to unionize nonunion shops, even where no dispute exists between employer and employees. (See Rest. Torts, comment c to § 788.) In truth, it may be said that to each of its members a union owes the duty of exerting its best efforts to improve his economic position. But such efforts have in the past been confined at least primarily to the betterment of working conditions of laboring men who were in the status of employees —not of those who operated independent businesses, with or without employees. By Chief Justice Gibson's opinion this court will impose upon unions the anomalous choice of permitting peddlers to operate their businesses as they wish and thus endanger many benefits to working men which labor has secured only after long and arduous struggles, or else to admit

to membership these same peddlers, and then as a duty owing to them as members, *attempt to improve their lot*. The interests of labor on the one hand and of independent businessmen —be they called peddlers, businessmen-workers, or by any other appellation—on the other, are conflicting and are not to be solved by decree of this court that they must unite in a joint union.

As declared by this court, speaking through Mr. Justice Edmonds, in *C. S. Smith Met. Market Co.* v. *Lyons* (1940), 16 Cal.2d 389, 403-404 [106 P.2d 414] : "The fear that they [labor unions] have grown so strong as to endanger vital civil liberties and disrupt the functioning of our economic system is an argument exclusively for the consideration of the legislature. Upon this point Mr. Justice Brandeis aptly stated in one of his dissenting opinions: 'Because I have come to the conclusion that both the common law of a state and a statute of the United States declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest, I do not wish to be understood as attaching any constitutional or moral sanction to that right. All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature, which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat.' *(Duplex Printing Press Co.* v. *Deering* (1921), 254 U.S. 443, 448 [41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196].)''

So far as concerns the methods used by defendants here in their efforts to maintain employment at union standards for members of the union, there appears to be no real distinction between such methods and those commonly used by other peaceful and honest businessmen who seek in a free market to take business away from their competitors.

In *Katz* v. *Kapper* (1935), 7 Cal.App.2d 1 [44 P.2d 1060], the District Court of Appeal had before it a question as to the sufficiency of a complaint to state a cause of action for un-

fair competition. The complaint alleged, among other things, that (see p. 3 of 7 Cal.App.2d) "the defendants [fish dealers] maliciously called meetings of the customers of plaintiff, threatened them that they would be driven out of business and ruined if they continued to purchase fish from plaintiff, but promised that if they purchased fish from defendants, they would be given substantial reductions in price, so that they could successfully compete with plaintiff and drive him out of business; that if said customers continued to buy from plaintiff, the defendants would open a retail store and would sell fish to the customers of plaintiff's customers at such low prices that plaintiff's customers would be driven out of business." There were further allegations to the effect that defendants opened a store, advertised and sold fish at very low prices, at an actual loss to themselves, and deprived plaintiff of part of his business. The court declared (p. 4): "In deciding whether the conduct of defendants, alleged in the complaint is actionable, it is necessary to apply certain well-settled rules relating to competition in business. These may be generally stated as follows: 'Competition in business, though carried to the extent of ruining a rival, is not ordinarily actionable, but every trader is left to conduct his business in his own way, so long as the methods he employs do not involve wrongful conduct such as fraud, misrepresentation, intimidation, coercion, obstruction, or molestation of the rival or his servants or workmen, or the procurement of the violation of contractual relations. If disturbance or loss comes as the result of competition, or the exercise of like rights by others, as where a merchant undersells or oversells his neighbor, it is *damnum absque injuria.*' (15 R.C.L., p. 73, and cases cited.) . . . [P. 6] The fact that the methods used were ruthless, or unfair, in a moral sense, does not stamp them as illegal. It has never been regarded as the duty or province of the courts to regulate practices in the business world beyond the point of applying legal or equitable remedies in cases involving acts of oppression or deceit which are unlawful. Any extension of this jurisdiction must come through legislative action." I am neither approving nor disapproving the holding in the Katz case, but so long as the theory of free enterprise there defined is applied to activities of capital it should equally be applied to those of labor. I am not suggesting that competitive activities of labor organizations may not be subject to

reasonable control but I am definitely opposed to the application of a double standard which would deny to organizations of one character activities which it condones in the other.

Defendants here are the competitors of plaintiffs in that the defendants are seeking to secure employment for members of the union to do the very work which plaintiffs are now doing, or, in another aspect of the matter, to gain as customers for members of organized labor those persons who now are customers of independent businessmen. However costly some of the attributes of free enterprise may be, it is established in this state that "Competitive freedom . . . is of sufficient importance to justify one competitor in inducing a third party to forsake another competitor if no contractual relationship exists between the latter two." (*Imperial Ice Co.* v. *Rossier* (1941), 18 Cal.2d 33, 36 [112 P.2d 631], and cases there cited.) No claim is made by plaintiffs that defendants here induced any customers of the plaintiffs to breach any contract with them or induced any of the milk brokers to breach a contract between plaintiffs and such brokers, and it was for the brokers to determine whether or not they wished to accede to defendants' peaceful request that they cease selling to plaintiffs. The weapons of labor—strikes, picketing, and boycotts—are means of persuasion, moral and economic, and action induced thereby or in contemplation of the possibility thereof is voluntary. (See *Matson Terminals, Inc.* v. *California Emp. Com.* (1944), 24 Cal. 2d 695, 703 [151 P.2d 202]; *Bodinson Mfg. Co.* v. *California Emp. Com.* (1941), 17 Cal.2d 321, 327, 328 [109 P.2d 935].)

This case exposes the institution of free enterprise to the test for democratic fairness in its operation and administration. If it is lawful, in the interests of free enterprise, for capital organizations to wield their economic power to gain customers from competitors or to seek to gain control of sources of supply of items of merchandise, even though the practical result may be to force a competitor out of the particular business or to preclude him from handling a certain item, then it should be equally lawful for a labor organization to wield its power to a similar end. That which is considered merely smart business when done by an organization of capital should not give rise to injunctive relief when proposed by an organization of labor. Admittedly the purpose in each case is a selfish one in the sense that each is seeking

to promote the welfare of its own members. Certainly there may be a public interest in both cases and the state may prescribe reasonable limitations beyond which the personal interests of the organized groups may not trespass on the public interest and perhaps not on the private interests of each other. But the mere fact that the purpose is selfish does not make it unlawful. In the case of *McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), 16 Cal.2d 311, 323 [106 P.2d 373], in discussing the case of *J. F. Parkinson Co.* v. *Building Trades Council* (1908), *supra,* 154 Cal. 581 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550], this court declared: "The ultimate motive for their activities was self-interest—'to secure employment on more favorable terms for themselves', and in pursuit of that purpose they could lawfully attempt 'to secure employment by the plaintiff, to the exclusion of those not associated with them'." Hence, as to the case at bar, it must rest with the legislative rather than with the judicial branch of government to establish limits which are narrower in compass than the fundamental law itself ordains.

It is argued here, for plaintiffs, that this is not a controversy between an employer and an employee and hence that it is not a legitimate labor controversy. It is a strange and unnatural concept which would limit organized labor to working only in the fields of employers. If organized labor cannot direct its weapons against unorganized workers and nonemployer businessmen as well as against employers it will, indeed, be shackled. Such shackles, if they are to be forged at all, should be wrought by the Legislature and not by the courts. If in the Emde case it was true, as declared for this court by Mr. Justice Edmonds (p. 155 of 23 Cal.2d), that "it may not be denied that . . . the dissatisfaction of organized labor with a system of distributing milk products which avoids minimum wages and hours, workmen's compensation and social security benefits, is a legitimate matter of labor dispute," then that declaration is equally true here. Certainly the fact that plaintiffs in this case had been engaging for several years—instead of for a few weeks only, as in the Emde case—in "a system of distributing milk products which avoids minimum wages and hours, workmen's compensation and social security benefits," should not be expected to lessen organized labor's interest in stopping that system or plaintiffs' participation in it. Even if we regard the plaintiffs

as workers it is just as much in the interest of organized labor to have the principle of the Emde case recognized and respected by workers—and to seek to persuade them to that end —as it is to have such principle accepted by employers.

If organized labor may lawfully picket or boycott an employer because he employs nonunion labor then it may equally lawfully picket or boycott the nonunion worker. In the absence of a valid statute proscribing such practice, if a secondary boycott is lawful in one case it is in the other. That the boycott, either primary or secondary, is a form of economic persuasion which may be employed to accomplish any lawful purpose is firmly established. (*McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra,* 16 Cal.2d 311, 319; *C. S. Smith Met. Market Co.* v. *Lyons* (1940), *supra,* 16 Cal. 2d 389, 395; *Fortenbury* v. *Superior Court* (1940), 16 Cal. 2d 405, 409 [106 P.2d 411].)

One of the arguments advanced for the plaintiffs places the right to operate a private business without employees above the right to operate a similar business with employees. I perceive no reasonable ground for making such distinction. If the business of milk distributing is operated with employees it is admitted (as it must be because of such decisions as *Senn* v. *Tile Layers Protective Union* (1937), 301 U. S. 468, 480, 481 [57 S.Ct. 857, 863, 81 L.Ed. 1229, 1237]; *American Fed. of Labor* v. *Swing* (1941), *supra,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855]; *Emde* v. *San Joaquin County etc. Council* (1943), *supra,* 23 Cal.2d 146) that the hours and conditions of work, etc., of those actually distributing the milk as employees are a legitimate subject of labor interest and action. Indeed, in the Emde case Mr. Justice Edmonds says specifically that (p. 155 of 23 Cal.2d) ''the union, and those directly interested in and connected with the labor cause [including in the cited case certain other labor organizations, certain of their officers, and a newspaper], had the right to urge the public *and, of course, the members of organized labor,* to refrain from buying the dairy's products unless the dairy abandoned the system of distribution which it had undertaken and rehired union drivers in accordance with the terms of the existing contract, *whether or not the employer-employee relation then existed between the members of the union and the dairy.*'' (Italics added.) Surely the interest of organized labor in enforcing the above quoted

proposition extends to and against nonemployer businessmen and workers in the industry who are not members of the labor organization just as much as to an employer, the public generally, and members of the union. And if the quoted proposition is sound when applied to the *rehiring* of union workers it should be equally sound in application to inducing *original* hiring. The "term 'labor dispute' is a broad one, and, in the absence of statutory definition, may be properly applied to any controversy 'which is reasonably related to employment and to the purposes of collective bargaining'." (*McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra*, 16 Cal.2d 311, 324.) A labor organization which contented itself with protecting existing contracts only and which did not seek the establishment of new contracts or the extension of employment for its members would hardly measure up to the scope and standard of action commonly exhibited by labor unions. If the extension of such contracts and the seeking of further employment are lawful and if the means used to attain those purposes are otherwise lawful, then the pressure designed to attain the desired ends can be applied to the nonemployer businessman and to the nonconforming worker just as well as to an employer.

I have endeavored to make it clear that we do not here have before us any question as to the right of the union to arbitrarily refuse membership to the plaintiffs on a basis of equality with its other members or any request by the union for equitable relief in which the question of its refusal of membership might be pertinent as touching on its right to invoke equity. It is not contended by plaintiffs that they sought employment as employees, or membership in the union in the status of employees. They are, and insist upon continuing to be, independent businessmen. They sought membership in the union not to conform to, or to support, its objects and program, but solely to further their own interests as independent businessmen in competition with the interests and objects of the union.

As declared by this court in the McKay case (*supra*, 16 Cal.2d 311, 320), "It is a fundamental principle that the drastic sanctions of equity may not be invoked without a detailed showing of specific facts justifying such relief." The defendants here were competing with plaintiffs for the milk distributing business, seeking to get for the defendant union's

members as employees the business which plaintiffs were doing as independent peddlers. "And competition for work being an entirely lawful activity, whether the competing groups be unions, or unions and individuals, a court of equity may not interfere by restraining the use of any lawful form of concerted action used in the struggle." (*McKay* v. *Retail Auto. S. L. Union No. 1067* (1940), *supra*, p. 322.)

From what has been said it is apparent that the defendants neither sought an unlawful end nor used unlawful means. They had the right to compete with plaintiffs in a free market for employment in the milk distributing business and they had the right to use the pressure of possible boycott to aid their cause. In my opinion the judgment granting the injunctive relief sought by plaintiffs should be reversed.

Carter, J., and Traynor, J., concurred.

Appellants' petition for a rehearing was denied January 29, 1945. Carter, J., Traynor, J., and Schauer, J., voted for a rehearing.