[Crim. No. 4733.   In Bank.   Oct. 3, 1947.]

In re W. T. BLANEY, on Habeas Corpus.

Clarence E. Todd, John C. Stevenson and Huston T. Carlyle for Petitioner.

Robert W. Gilbert, Hildebrand, Bills & McLeod, Robert W. Kenny, Attorney General, Clarence A. Linn, Assistant Attorney General, and Tobriner & Lazarus, as Amici Curiae on behalf of Petitioner.

Fred N. Howser, District Attorney (Los Angeles), Jere J. Sullivan, Deputy District Attorney, for Respondent.

Gilford G. Rowland, Russell E. Parsons, O'Melveny & Myers, Homer I. Mitchell, W. B. Carman, Jr., Deane F. Johnson, Tuttle & Tuttle, C. W. Cornell, E. L. H. Bissinger, Eugene M. Prince, Richard E. Widekind, Burton Mason, C. W. Dooling, Latham & Watkins, J. L. Goddard and Olive E. Boswell, as Amici Curiae on behalf of Respondent.

CARTER, J.—Prior to the commencement of this proceeding, one H. C. Ramser, doing business as the Upholstery Supply Company, hereinafter referred to as Ramser, prosecuted an action for damages and injunctive relief in the Superior Court of Los Angeles County against various labor unions, W. T. Blaney, a member and business representative of Van Storage and Furniture Drivers, Packers and Helper's Local Union No. 389 (hereinafter referred to as Van Storage Union), one of the unions. Various business firms who employed labor, and who were either suppliers, carriers or customers of Ramser (hereinafter referred to as dealers) were made parties defendants. Ramser manufactures and assembles commodities that go into furniture and sells furniture supplies. The members of Van Storage Union were picketing Ramser and demanding a closed shop contract. A temporary restraining order was issued, generally forbidding Blaney from doing various acts which were aimed at persuading the dealers to refrain from dealing with Ramser. It is disputed whether most of Ramser's employees were members of the union and whether Ramser is engaged in interstate commerce, but those matters are of no significance here in view of the limited scope of the restraining order. The

restraining order commanded Blaney and his union to refrain from attempting to do or doing any of the following: "(a) Combining or agreeing to cease performing or to cause any employee of [the dealers] to cease performing any service or services for said [dealers], or any of them, or causing or agreeing to cause or threatening to cause any loss or injury to such [dealers] or any of them, for the purpose of inducing or compelling such [dealers] or any of them to refrain from doing business with [Ramser] or furnishing any supplies to [Ramser] in his business, or purchasing any supplies from [Ramser], or carrying, shipping, or receiving any freight or merchandise for [Ramser]; or

"(b) In any way carrying out or effectuating any such combination or agreement, or in any way giving any notices or making any threats intended or tending to effectuate or carry out any such agreement;

"(c) Provided, however, that nothing herein is intended or shall be construed to prohibit peaceful picketing when the same is not done pursuant to or for the purpose of carrying out any combination or agreement herein restrained or enjoined."

After application therefor an order to show cause why Blaney should not be punished for violation of the restraining order was issued and he was found guilty of contempt and committed to the county jail. The judgment of contempt recites that Ramser's action was to secure injunctive relief against the violation by Blaney of the legislative act (approved by a referendum of the people November 3, 1942), commonly referred to as the "hot cargo law." (Lab. Code, §§ 1131-1136, as added by Stats. 1941, ch. 623.) He seeks relief by way of habeas corpus. In the judgment the court found six counts of violation of the restraining order as follows: (1) that Blaney stated to a customer of Ramser that if it accepted merchandise from him the union would picket and boycott its plant and products; (2) that similar statements were made to another of Ramser's customers and also that the public and labor would be informed that the customer was selling "unfair" products and a picket line was established; (3) that Blaney told a supplier of Ramser he must not supply him because there was a strike at Ramser's place of business and all products of Ramser were to be picketed. The supplier complied with Blaney's demand; (4) that

conduct similar to the above was followed as to another of Ramser's customers; (5) that Blaney told the Railway Express Agency, Inc., that if it accepted for shipment products of Ramser it would be picketed; (6) that the Southern Pacific Company, a common carrier, was informed that if it permitted Ramser to unload from its freight cars, products which had been shipped to him, it would be picketed. Thus it appears that Blaney agreed with the other members of his union to cause and threaten to cause employees of the dealers to cease performing services, and the dealers from doing business with Ramser; that on certain dates Blaney, in furtherance of the agreement, stated to Ramser's dealers that if they accepted Ramser's merchandise they also would be picketed and "tied up" by picketing and boycotting; that some dealers were picketed, the pickets claiming that dealing with Ramser was unfair to organized labor and the like.

The "hot cargo act" reads: "The 'hot cargo' and 'secondary boycott' are hereby declared to be unlawful." (Lab. Code, § 1131.) "As used in this chapter, 'hot cargo' means any combination or agreement resulting in a refusal by employees to handle goods or to perform any services for their employer because of a dispute between some other employer and his employees or a labor organization or any combination or agreement resulting in a refusal by employers to handle goods or perform any services for another employer because of an agreement between such other employer and his employees or a labor organization.

"(b) ['*Secondary boycott.*'] As used in this chapter, 'secondary boycott' means any combination or agreement to cease performing, or to cause any employee to cease performing any services for any employer, or to cause any loss or injury to such employer, or to his employees, for the purpose of inducing or compelling such employer to refrain from doing business with, or handling the products of any other employer because of a dispute between the latter and his employees or a labor organization or any combination or agreement to cease performing, or to cause any employer to cease performing any services for another employer, or to cause any loss or injury to such other employer, or to his employees, for the purpose of inducing or compelling such other employer to refrain from doing business with, or handling the products of any other employer, because of an

agreement between the latter and his employees or a labor organization.

"(c) ['*Labor organization.*'] As used in this chapter, 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

"(d) ['*Employer.*'] As used in this chapter, the term 'employer' includes any person acting in the interest of an employer, directly or indirectly and any association of employers, including growers and other hirers of labor.

"(e) ['*Employee.*'] As used in this chapter, the term 'employee' includes any natural person who works for any person for compensation." (Lab. Code, § 1134.)

"Any act, combination or agreement which directly or indirectly causes, induces or compels a violation of any of the provisions of this chapter, or inflicts any loss, injury or damage on anyone because of his refusal to violate any of the provisions of this chapter shall be unlawful." (Lab. Code, § 1132.) Provision is made for injunctive relief and damages to a person injured by a violation of the statute. (Lab. Code, § 1133.)

The identification of the constitutional protection of the right of free speech, press and assembly, with the publicizing of labor disputes or problems through the medium of picketing, boycotting and otherwise, has been established. (*Thomas* v. *Collins,* 323 U.S. 516 [65 S.Ct. 315, 89 L.Ed. 430]; *Cafeteria Union, Local 302* v. *Angelos,* 320 U.S. 293 [64 S.Ct. 126, 88 L.Ed. 58]; *Hotel Employees' Local* v. *Board,* 315 U.S. 437 [62 S.Ct. 706, 86 L.Ed. 946]; *Bakery Drivers' Local* v. *Wohl,* 315 U.S. 769 [62 S.Ct. 816, 86 L.Ed. 1178]; *Carpenters' Union* v. *Ritter's Cafe,* 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143]; *A. F. of L.* v. *Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855]; *Carlson* v. *California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104]; *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; *Senn* v. *Tile Layers' Union,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229]; *In re Porterfield,* 28 Cal.2d 91, 114 [168 P.2d 706, 167 A.L.R. 675]; *Park & T. I. Corp.* v. *International etc. of Teamsters,* 27 Cal. 2d 599, 608 [165 P.2d 891, 162 A.L.R. 1426]; *James* v. *Marin-*

*ship Corp.,* 25 Cal.2d 721, 729-730 [155 P.2d 329, 160 A.L.R. 900] ; *Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146, 154, 161 [143 P.2d 20, 150 A.L.R. 916] ; *People* v. *Dail,* 22 Cal.2d 642, 651 [140 P.2d 828] ; *Magill Bros.* v. *Bldg. Service etc. Union,* 20 Cal.2d 506, 511 [127 P.2d 542] ; *In re Bell,* 19 Cal.2d 488, 497 [122 P.2d 22] ; *Steiner* v. *Long Beach Local No. 128,* 19 Cal.2d 676 [123 P.2d 20] ; *McKay* v. *Retail Auto S. L. Union No. 1067,* 16 Cal.2d 311, 319, 333 [106 P.2d 373] ; *In re Lyons,* 27 Cal.App.2d 293 [80 P.2d 745].) It has been phrased by this court in various ways. "It is now settled law that workmen may lawfully combine to exert various forms of economic pressure upon an employer, provided the object sought to be accomplished thereby has a reasonable relation to the betterment of labor conditions, and they act peaceably and honestly. (Citations) This right is guaranteed by the federal Constitution as an incident of freedom of speech, press and assemblage, (citations) and it is not dependent upon the existence of a labor controversy between the employer and his employee." (*Steiner* v. *Long Beach Local No. 128, supra,* at p. 682.) "Various means of economic suasion such as picketing, the primary and secondary boycotts, and refusal to work together, often go to make up concerted efforts to induce nonmember employees to join a particular union. Such conduct may be performed in the exercise of civil liberties, guaranteed by both our federal and state Constitutions." (*In re Porterfield, supra,* p. 114.) It has been indicated, however, that the protection afforded by the free speech guarantee of the right to publicize a labor dispute by picketing, boycotting or otherwise is not absolute or necessarily controlled by the clear and present danger test. (That test is the accepted one in the ordinary free speech cases. (*Thomas* v. *Collins, supra.*)) Generally, as stated in *Thornhill* v. *Alabama, supra,* at page 103 : "It is true that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants." And the purpose of the economic pressure and the means used to exert it must be lawful, (*Park & T. I. Corp.* v. *International etc. of Teamsters, supra; James* v. *Marinship Corp., supra.*) but that proposition poses the question in terms of results. Rather

it is merely stating the problem in other words. ▮ The question still remains as to what purposes or what means may be declared unlawful by the Legislature or the courts without violating the provisions of the Constitution. Specifically, restraint may be laid by the state where the past conduct of the pickets is so characterized by extreme violence and riotous conduct that peaceful activity is inescapably connected therewith and cannot be separated, and there is an unravelable enmeshment of the peaceful with the unlawful conduct. (*Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200]; *Steiner* v. *Long Beach Local No. 128, supra.*) It has been held that the information disseminated by the pickets must be truthful. (*Magill Bros.* v. *Bldg. Service etc. Union, supra;* *Park & T. I. Corp.* v. *International etc. of Teamsters, supra.*) ▮ But in that connection the use of such words as "unfair" or "unfair to organized labor" is not a falsification of facts and "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist' is not to falsify facts." (*Cafeteria Employees Union* v. *Angelos, supra;* see *Park & T. I. Corp.* v. *International etc. of Teamsters, supra.*) It has been held that a state may validly declare that its welfare will not be served if "in a controversy between a contractor and building workers' union, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder." (*Carpenters Union* v. *Ritter's Cafe, supra,* 726.) The court there stated that it was not "confronted—with a limitation upon speech in circumstances where there exists an 'interdependence of economic interest of all engaged in the same industry.'" (*Carpenters Union* v. *Ritter's Cafe, supra,* 727.) And in *Bakery Drivers Local* v. *Wohl, supra,* the court held that a labor union of drivers of bakery wagons was constitutionally protected in picketing the customers and bakery suppliers to advise those persons of its grievance against peddlers of such commodity who obtained it from the bakeries and sold it to the customers, all in order to induce the peddlers to work only six days a week and to hire a union member one day a week. And *A. F. of L.* v. *Swing, supra,* holds that the constitutional guarantee is infringed by the state's limitation

of peaceful picketing by labor unions to cases in which the controversy is between the employer and his employees.

■ Regardless of the area to which the concerted labor activity, such as picketing or boycotting may be constitutionally limited, and the facts of the case at bar as above disclosed, the statute here involved cannot stand. It and the restraining order issued pursuant to it are too sweeping, vague and uncertain. It permits the prior censorship of matters undeniably protected by the constitutional guarantee of free speech and press. (See *Near* v. *Minnesota,* 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed. 1357].) It makes enjoinable the mere combination or agreement resulting in the refusal by employees to handle goods for their employer because of a dispute between some other employer and his employees or a labor organization. (Lab. Code, § 1134(a).) Under that provision should a group of employees or a union merely agree to give publicity to their disputes with their employers by radio or newspaper, if that agreement and publicity results in persuading the employees of some other employer to withhold services from their employer, an injunction will lie. In other words, their freedom to publicize their labor disputes or even to agree to do so is penalized. This result is made even more likely by the provision that any agreement which *indirectly induces* the withholding of services amounts to an unlawful act. (Lab. Code, § 1132.) Likewise, under the secondary boycott provision (Lab. Code, § 1134(b)) a mere agreement to cause any employee to cease performing services for an employer or to cause an employer not in the dispute to cease dealing with the employer in the dispute for the purpose of bringing pressure upon the latter is denounced. There is also encompassed within its terms the mere agreement to publicize a labor dispute with the purpose of persuading other employees to cease dealing with the employer in the dispute. The inducement or persuasion to refrain from dealing may be accomplished merely by advising the dealer of the controversy and requesting him to refrain from dealing, a matter beyond doubt within the realm of the right of free speech. Merely because the object, the intermediate object (the main objective being to correct a grievance against the employer with whom the dispute exists), is to induce third persons (the dealers) to assist in exerting the economic pressure, does not create an unlawful aim. Nor is the communication of the facts of the existence of the dispute to

them (the dealers) and persuading them to withhold their business, an unlawful means of furthering the campaign against the employer with whom the controversy exists. A statute so broadly and loosely drawn—which places it within the power of a court to grant injunctive relief, which by its terms may be used to strike down the right to freedom of speech, is a prior restraint upon that right and falls squarely within the rule recently declared by this court. In *In re Bell*, 19 Cal.2d 488 [122 P.2d 22], the ordinance made it a crime "for any person to loiter, stand, or sit upon any public highway, alley, sidewalk or crosswalk so as to in any manner hinder or obstruct the free passage . . . of persons or vehicles. . . ." (P. 496.) The court stated the rule to be that (at p. 495): "The ordinance must be judged on its face to determine whether its unconstitutionality prohibits acts that fall within the category of peaceful picketing. (*Thornhill* v. *Alabama*, 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]; *Carlson* v. *California*, 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed 1104]; *Hague* v. *C.I.O.*, 307 U.S. 496, 518 [59 S.Ct. 954, 83 L.Ed. 1423]; *Schneider* v. *State*, 308 U.S. 147, 162-165 [60 S.Ct. 146, 84 L.Ed. 155]; *Lovell* v. *Griffin*, 303 U.S. 444, 451 [58 S.Ct. 666, 82 L.Ed. 949]; *Stromberg* v. *California*, 283 U.S. 359, 369, 370 [51 S.Ct. 532, 75 L.Ed. 1117]; see *Near* v. *Minnesota*, 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed. 1357]; *Yick Wo* v. *Hopkins*, 118 U.S. 356 [6 St.Ct. 1064, 30 L.Ed. 220].) *If certain of its provisions operate to prohibit peaceful picketing, they are invalid even though they also prohibit acts that may properly be made illegal.* A penal statute that 'does not aim specifically at evils within the allowable area of State control, but on the contrary, *sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech* or of the press . . . lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure' and 'results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview.' (*Thornhill* v. *Alabama, supra*, at 97.) *It is not the function of the court to determine whether the restrictions imposed by the legislation can be validly applied to the facts of a particular case.* 'Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the

dissemination of ideas.' (*Thornhill* v. *Alabama, supra*, at 97; *Hague* v. *C.I.O., supra; Lovell* v. *Griffin, supra; Schneider* v. *State, supra*.) Language prohibiting conduct that may be prohibited and conduct that may not affords no reasonably ascertainable standard of guilt and is therefore too uncertain and vague to be enforced. (*Stromberg* v. *California, supra*, 369-370; *Herndon* v. *Lowry*, 301 U.S. 242, 261-263 [57 S.Ct. 732, 81 L.Ed. 1066]; *Lanzetta* v. *New Jersey*, 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888]; *De Jonge* v. *Oregon*, 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278]; *Hague* v. *C.I.O., supra; Schneider* v. *State, supra; In re Harder*, 9 Cal.App.2d 153, 155 [49 P.2d 304]; *Territory of Hawaii* v. *Anduha*, 48 F.2d 171.)''. (Emphasis added.) Likewise, it is said in *Thornhill* v. *Alabama*, 310 U.S. 88, 96 [60 S.Ct. 736, 84 L.Ed. 1093], concerning a statute denouncing picketing: ''The State urges that petitioner may not complain of the deprivation of any rights but his own. It would not follow that on this record petitioner could not complain of the sweeping regulations here challenged.

''There is a further reason for testing the section on its face. Proof of the abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas. (Citations.) The cases when interpreted in the light of their facts indicate that the rule is not based upon any assumption that application for the license would be refused or would result in the imposition of other unlawful regulations. Rather it derives from an appreciation of the character of the evil inherent in a licensing system. The power of the licensor against which John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing' is pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. (Citation.) One who might have had a license for the asking may therefore call into question the whole scheme of licensing when he is prosecuted for failure to procure it. (Citations.) A like threat is inherent in a penal statute, like that in question here, which *does not aim specifically at evils within the allowable area of state control* but, on the contrary, *sweeps within its ambit other activities*

*that in ordinary circumstances constitute an exercise of freedom of speech or of the press.* The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview. It is not any less effective or, if the restraint is not permissible, less pernicious than the restraint on freedom of discussion imposed by the threat of censorship. An accused, after arrest and conviction under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. (Citation.) Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression.'' [Emphasis added.] See, also, *Carlson* v. *California,* 310 U.S. 106, 112 [60 S.Ct. 746, 84 L.Ed. 1104] ; *Cantwell* v. *Connecticut,* 310 U.S. 296, 306 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352] ; *Hague* v. *C.I.O.,* 307 U.S. 496, 518 [59 S.Ct. 954, 83 L.Ed. 1423] ; *Lanzetta* v. *New Jersey,* 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888] ; *Lovell* v. *Griffin,* 303 U.S. 444, 452 [58 S.Ct. 666, 82 L.Ed. 949] ; *Stromberg* v. *California,* 283 U.S. 359, 369 [51 S.Ct. 532, 75 L.Ed. 1117] ; *In re Porterfield, supra,* 115.)

■ The statute in question contains the provision that ''If any provision of this chapter, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this chapter, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall be not affected thereby.'' (Lab. Code, § 1136.) That separability clause cannot save it. As stated in *Lanzetta* v. *New Jersey, supra,* at page 453 : ''If on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it. . . . *No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.*'' [Emphasis added.] While the instant statute does not directly impose

criminal penalties, it does provide for injunctive relief in the event of its violation and the penalty for disobeying an injunction is contempt of court. It is a coercive measure and a person does not know in advance whether its application to his conduct will be constitutional or unconstitutional. He should not be required at his peril to make that determination, or as stated in *In re Porterfield, supra,* at page 120: "The potential severability of the ordinance, however, can have no effect upon the instant matter. As far as petitioner is concerned the existence of the statute as a whole was an operative fact. The consequences of its existence as such cannot be ignored. In order for petitioner to have secured a license he would have had to have complied with the terms of the ordinance as written. In *Smith* v. *Cahoon* (1931), 283 U.S. 553, 563-565 [51 S.Ct. 582, 75 L.Ed. 1264], a private carrier for hire was convicted of the charge of operating vehicles upon the highways without having obtained the certificate of public convenience and necessity and without having paid the tax required by a statute of the State of Florida. Upon habeas corpus defendant successfully contested the constitutionality of certain provisions of the statute as applied to private carriers. It was contended in support of the conviction, however, that a savings clause removed the infirmity of the statute. In denying the efficacy of the contention and holding that defendant was entitled to assert his constitutional right by virtue of the invalidity of the statute upon its face, the United States Supreme Court stated (page 563 of 283 U.S.): 'The effect of this savings clause is merely that, if one provision is struck down as invalid others may stand. But until such separation has been accomplished by judicial decision, the statute remains with its inclusive purport, and those concerned in its application have no means of knowing definitely what eventually will be eliminated and what will be left.' " Such a statute, in the language of the Supreme Court of the United States in *Thornhill* v. *Alabama, supra,* "Lends itself to harsh and discriminatory enforcement by local prosecuting officials [in the instant case the trial court is granting temporary restraining order and preliminary and permanent injunctions] against particular groups deemed to merit their displeasure," and "results in a continuous and pervasive restraint on all freedom of discussion [of the labor controversy] that might reasonably be regarded as within its purview." It is true that if the statute is severable, that is, if the void part described above can be

eliminated, then the court is faced with the necessity of determining whether the portion which remains, or any part of such remainder, which was violated by Blaney, is valid and enforceable. But if the statute is not severable, then the void part taints the remainder and the whole becomes a nullity. It is also true that in considering the issue of severability, it must be recognized that the general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of a statute unconstitutional in part. This is possible and proper where the language of the statute is mechanically severable, that is, where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase, or even single words. (See *In re Bell,* 19 Cal.2d 488, 498 [122 P.2d 22], Stern, *Separability and Separability Clauses in the Supreme Court,* 51 Harv. L.Rev. 76, 79.) On the other hand, where there is no possibility of mechanical severance, as where the language is so broad as to cover subjects within and without the legislative power, and the defect cannot be cured by excising any word or group of words, the problem is quite different and more difficult of solution. It is the latter situation which is presented by this case. As we have seen the hot cargo act applies generally to ''any combination or agreement'' which has the result of causing third parties to refuse to deal with or handle the goods of the employer involved in the dispute. Its provisions are not segregated in such a way as to differentiate between peaceful publicizing of the facts of a labor dispute, and secondary boycotts involving economic pressure against third parties directly or indirectly connected with the dispute. The only way in which such segregation could be made would be by judicial interpretation, first holding that the act as it stands is wholly unconstitutional, but then determining that, by inserting qualifications and exceptions in the statutory language, a judicially reformed statute might be given some effect. Such a step seems to have been contemplated by the Legislature in enacting the unusual form of severability clauses in the act heretofore quoted (Lab. Code, § 1136). By this type of provision, the Legislature has in effect sought to delegate to the courts the task of rewriting the statute, directing them to set forth, in a succession of judicial opinions upholding or annulling judgments enforcing the provisions of the act, thus determining in advance the extent to which the Legislature may go in providing regulations in this field. It is an inescapable result that, in the meantime, those individuals who

guess correctly will be released by the courts, and those who guess incorrectly will be punished; but that no one, employer, employee, union or any one will know what the law is until, after violation of the statute, and judgment thereon, a higher court is given an opportunity to pass on the question of its validity as applied to the particular "person or circumstance."

█ Such a theory of judicial construction cannot be supported on either practical or legal grounds, and two well-settled propositions condemn the legislation under review here *in toto*: First, where an entire statute in general terms infringes upon the constitutional right of free speech, it will be stricken down in its entirety; and second, where, by reason of invalidity of some applications of a criminal statute it fails to state definite criteria of guilt, the whole constitutes an unconstitutional denial of due process of law. Similar legislation was held void on these grounds in the Bell case, 19 Cal. 2d 495, 497, and in other decisions as heretofore stated. The Legislature manifestly sought, in the instant case, to prohibit every form of boycott, including some kinds which are occasionally characterized as "primary." The deliberately chosen language, covering all such activities in general terms, with no attempt at segregation or classification, leaves this court with no alternative but to nullify the act.

The statute provides that it shall be in "effect until May 1, 1943, and thereafter: (a) During the continuance of the existence of the National emergency declared by the President of the United States to exist, by his proclamation issued under date of September 8, 1939. (b) During any period of war between the United States of America and any foreign power, legally declared to exist." (Lab. Code, § 1135.) And further, that "This act is enacted for the purpose of preserving tranquillity among the citizens of this commonwealth and to insure during this present critical period of National emergency and intensive armament the unobstructed production and distribution of the products of our factories and fields, for the continued protection and preservation of our democratic way of life and for the general welfare of the people of this State." (Stats. 1941, ch. 623, § 2.) In view of the result we are compelled to reach herein it is unnecessary to decide whether or not the statute is still in force. Nor are we concerned with whether it would be a valid measure during actual hostilities of war. The proceedings herein and all acts of which complaint are made occurred after the cessation of the actual warfare or hostilities in which this country was engaged at the time of

the enactment of the statute, although legally speaking a state of war may be said still to exist. The emergency presented since the cessation of hostilities is not one of getting sinews of war to the battlefields but is one of economic and social concern only. The possible clear and present danger existing during hostilities ceases to exist once they cease. ██ The actual existence of the emergency and not the limitation of the law to a prescribed period gives validity to the exercise of police power, and when the emergency ceases, the valid operation of the statute ends if it can be supported only by reason of the emergency. (*Hourigan* v. *North Bergan Tp.*, 113 N.J.L. 143 [172 A. 193, 785].) It is true that the urgency created by the economic and social problems which are the aftermath of war still remain. Such urgency is clearly insufficient to support the broad restraint on freedom of speech and the press embraced in the instant statute. It was aptly said by Mr. Justice Holmes, in his dissenting opinion in *Abrams* v. *United States*, 250 U.S. 616, 627 [40 S.Ct. 17, 63 L.Ed. 1173], in amplifying the rule stated in the majority opinion written by him in *Schenck* v. *United States*, 249 U.S. 47 [39 S.Ct. 247, 63 L.Ed. 470] (dealing with the statutes concerning the obstruction of the war effort in the first world war) : ''I do not doubt for a moment that by the same reasoning that would justify punishing persuasion to murder, the United States constitutionally may punish speech that produces or is intended to produce a clear and imminent danger that it will bring about forthwith certain substantive evils that the United States constitutionally may seek to prevent. The power undoubtedly is greater in time of war than in time of peace because war opens dangers that do not exist at other times.

''But as against dangers peculiar to war, as against others, the principle of the right to free speech is always the same. It is only the present danger of immediate evil or an intent to bring it about that warrants Congress in setting a limit to the expression of opinion where private rights are not concerned. Congress certainly cannot forbid all effort to change the mind of the country. . . . Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrants making any exception to the sweeping command. 'Congress shall make no law . . . abridging the freedom of speech.' ''

It is urged that from the record it appears that picketing was done which barred ingress and egress to and from Ram-

ser's place of business and that compulsion was exerted on common carriers to violate their lawful duty as such carriers to accept goods for transportation, which acts constitute unlawful picketing and unlawful purpose or object respectively, but the restraining order and judgment of contempt are clearly predicated upon a violation of the "hot cargo act" as seen from the initial recitation therein and we do not decide whether Blaney could have properly been found guilty of contempt for his acts in connection with common carriers.

The above considerations dispose of the essential issue in the proceeding before us, and it is both unnecessary and undesirable to venture into a discussion of the permissible limits of legislative regulation of secondary boycotts. This subject is difficult, highly controversial, and has engendered conflicting decisions by the state courts, without any sure guide in the decisions of the United States Supreme Court. Only the most general principles have been laid down by that court. We know that when a union aims its power of secondary boycott against businesses not connected with the industrial dispute, it goes beyond the limits of constitutional protection and is subject to regulation by the state (*Carpenters & Joiners Union* v. *Ritter's Cafe, supra*), and we know also that the state cannot confine the concerted action of labor to steps against the unfair employer alone (*Cafeteria Employees Union* v. *Angelos, supra; Bakery Drivers Local* v. *Wohl, supra*). Somewhere between these extremes, the line may be drawn, but it should be drawn in a case wherein the issue is directly presented, and is necessary for the decision, in order that an authoritative and binding pronouncement may be made by this court and, perhaps, by the United States Supreme Court.

The Legislature manifestly sought, in the instant case, to prohibit every form of boycott, including some kinds which are occasionally characterized as "primary." The deliberately chosen language, covering all such activities in general terms, with no attempt at segregation or classification, leaves this court with no alternative but to nullify the act. Only by a carefully drawn statute which separately treats the various forms of concerted action loosely termed "secondary boycotts," can the Legislature hope to accomplish the object of regulating those forms which may ultimately be held to be within its constitutional power.

It is therefore ordered that petitioner be discharged.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

SPENCE, J.—I concur in the judgment.

In the present proceeding the parties have discussed grave constitutional questions in the determination of which this court is bound by the decisions of the United States Supreme Court. With respect to some of those questions the decisions of the United States Supreme Court offer no certain guide, but upon the single question which appears to be decisive of this controversy, the decisions of that court clearly indicate that the statute before us (Lab. Code, §§ 1131, 1136) and the restraining order issued thereunder (which restraining order follows the wording of section 1134 of the Labor Code in its essential provisions) must be declared invalid as trenching upon fundamental rights guaranteed by the Constitution of the United States.

Much is said in the briefs, as well as in the majority and dissenting opinions herein, regarding the power of a state to prohibit picketing. The majority opinion stresses the decisions of the United States Supreme Court which tend to identify the right to picket with the constitutional rights of freedom of speech, of the press, and of assembly. The dissenting opinion stresses the recent decisions of that court which indicate that such rights are not identical, and that picketing may be declared unlawful and may be enjoined under various circumstances. The question here, however, is not the general one of whether picketing, in its relation to that which is commonly termed ''hot cargo'' or ''secondary boycott,'' may be constitutionally proscribed. The precise question for determination is whether the statute before us, defining ''hot cargo'' and ''secondary boycott'' in a particular manner (§ 1134, subds. (a) and (b)) and declaring them to be unlawful and enjoinable (§§ 1131, 1133), infringes upon constitutional guarantees. Having determined that the answer to the last question is that said statute does infringe upon constitutional guarantees, it may be assumed in this discussion that such picketing can be constitutionally proscribed by an appropriate statute drawn for the accomplishment of that purpose.

It should be emphasized that this particular statute is not merely an antipicketing statute. While the prevention of picketing may well have been one of the primary purposes of the framers of this legislation (despite the fact that the word ''picketing'' does not appear therein), the statute goes much further and covers a multitude of other activities. It will be sufficient to mention but a few. The broad language

of section 1134, subdivision (a), makes unlawful and enjoinable the mere agreement on the part of the employees engaged in the primary labor dispute to publish the facts of that dispute if such agreement and publication result in a refusal by the employees of another employer to perform any services for such other employer; and the broad language of section 1134, subdivision (b), makes unlawful and enjoinable any agreement on the part of such employees engaged in the primary labor dispute to publicize the facts of such dispute even among their fellow-employees for the purpose of inducing such employees to withhold patronage from other employers and for the ultimate purpose of inducing such other employers to refrain from doing business with the employer engaged in the primary dispute. Thus it appears that the language of said section 1134, subdivisions (a) and (b), purports to make unlawful and enjoinable certain acts, not involving such coercive methods as picketing, which acts are clearly protected by the guarantees of freedom of speech and of the press as found in our federal Constitution (U. S. Const., Amendments 1 and 14) and as construed by the United States Supreme Court in numerous cases cited in the majority opinion.

That which has been said regarding the infringement upon constitutional guarantees made by the provisions of section 1134, subdivisions (a) and (b) of the Labor Code, may likewise be said with greater force with respect to the provisions of section 1132. The last-mentioned section is not confined to any "combination or agreement" but it further declares unlawful "any *act* . . . which *directly or indirectly* . . . *induces* . . . a violation of any of the provisions of this chapter." (Emphasis added.) Thus under that section a single individual might be doing an unlawful and enjoinable act if he should merely voice or otherwise publicize the facts of a labor dispute under certain circumstances. It cannot be seriously contended that section 1132 can stand the constitutional tests laid down by the United States Supreme Court. While it is true that the provisions of that section were not made the basis of the restraining order in the present case, it is perhaps significant to note that the dissenting opinion makes no attempt to defend those provisions. They are mentioned here only to demonstrate further the wide range of activities which the statute purports to declare unlawful.

This court reviewed certain decisions of the United States Supreme Court in *James* v. *Marinship Corp.*, 25 Cal.2d 721

[155 P.2d 329, 160 A.L.R. 900], and, in recognizing both the legislative power and its limitations, said at page 730: "Thus a state may impose limitations upon picketing or other concerted action if the 'end sought' is not permissible under state law and public policy, though any such limitations are subject to review by the United States Supreme Court, and will be annulled if they unreasonably interfere with labor's right to publicize the facts of a labor dispute." Under any view of the controlling decisions of the United States Supreme Court, it is clear that the above-mentioned provisions of the statute do "unreasonably interfere with labor's right to publicize the facts of a labor dispute," and that they must be declared unconstitutional for that reason. It is immaterial that a constitutional statute might have been drawn proscribing the specific acts which Blaney was found to have done in violation of the broad terms of the restraining order. Here both the restraining order and the section of the statute upon which it was based (§ 1134) cover acts which cannot be constitutionally proscribed as well as those which can, and I agree with the conclusion reached in the majority opinion that the provisions of said section are not mechanically severable so as to permit reliance upon the severability clause (Lab. Code, § 1136) to save the statute or to sustain the judgment of contempt which is under attack. It therefore follows that petitioner is entitled to his discharge.

Edmonds, J., concurred.

SHENK, J.—I dissent.

This court has repeatedly said, in accord with prevailing judicial opinion elsewhere, that conflicts in labor-management relations can best be controlled, not by the courts but by the Legislature. (*Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, 599, 610 [98 P. 1027, 16 Ann.Cas. 1165, 21 L.R.A.N.S. 550]; *C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, 400, 403 [106 P.2d 414]; *Magill Bros.* v. *Building Service etc. Union,* 20 Cal.2d 506, 510 [127 P.2d 542]; *James* v. *Marinship Corp.,* 25 Cal.2d 721, 729, 730 [155 P.2d 329, 160 A.L.R. 900]; *Park & T. I. Corp.* v. *International etc. of Teamsters,* 27 Cal. 2d 599, 609 [165 P.2d 891, 162 A.L.R. 1426].) Since those decisions were rendered the Legislature has acted, not once but twice in declaring the "hot cargo" and "secondary boy-

cott'' unlawful labor practices and has provided redress by civil action.

The first act was passed in 1941 (Stats. 1941, p. 2079). The referendum was invoked against it and the effective date of the act was postponed until its approval by the electors of the state at the general election in November, 1942. During the campaign for and against it the terms of the enactment were extensively discussed, and its meaning and effect were thoroughly understood. That act contained a provision limiting its effective duration until May 1, 1943, and thereafter during the period of war between the United States and any foreign power.

The last session of the Legislature (Stats. 1947, p. 844, ch. 278) eliminated the emergency provision but without changing the law as enacted in 1941. This was done after extensive discussion and hearings during the legislative session. Now, after the Legislature has twice so acted and the electors of the state have approved the law, this court proceeds to strike it down for reasons which I deem insufficient and not compelled by any constitutional provision or by any decision of the Supreme Court of the United States.

The petitioner, W. T. Blaney, sought his release from restraint under a commitment for contempt of an injunctive order issued in an action for damages and injunctive relief brought in the Superior Court in Los Angeles County pursuant to sections 1131-1136 of the Labor Code commonly called the "Hot Cargo and Secondary Boycott Act" (Stats. 1941, p. 2079). The action had been brought by one Ramser, doing business as the Upholstery Supply Company, against specified drivers' and teamsters' unions affiliated with the American Federation of Labor, various freight lines, and other defendants including the petitioner individually and as business representative of one of the unions. I will refer to the parties in that action as "plaintiff" and "defendants."

The plaintiff's plant was being picketed because of a strike by his employees. The order, dated April 18, 1946, restrained the unions and their affiliates from making any combination or agreement which would cause or attempt to cause employees of any supplier or customer or carrier of the plaintiff to cease performing services for any such employer for the purpose of causing the latter to refrain from furnishing supplies to or purchasing supplies from the plaintiff, or carrying or shipping freight or merchandise for the

plaintiff. The order excepted from its operation peaceful picketing when not done pursuant to the prohibited combination or agreement. The court thereby sought to enjoin combinations or agreements in aid of threatened "hot cargo" operations or "secondary boycott" of the plaintiff's business, by which the employees of his carriers, suppliers and customers might be induced by picketing or otherwise to prevent their employers from carrying out their contracts with the plaintiff, without affecting the peaceful picketing of the plaintiff's plant by his employees. After hearing on a citation for contempt, the court found that the petitioner, in combination with others, had committed acts in violation of the order, and imposed both fine and imprisonment.

The acts restrained and found to have been committed were within the definition of "hot cargo" and "secondary boycott" declared unlawful by sections 1131 et seq., of the Labor Code. This proceeding therefore presented for determination certain questions concerning the constitutionality of the Hot Cargo and Secondary Boycott Act.

By section 1131 of the Labor Code the "hot cargo" and "secondary boycott" are declared to be unlawful. Section 1132 also declares unlawful any act, combination or agreement which directly or indirectly causes, induces or compels a violation of any provision of the act, or inflicts loss, injury or damage to anyone because of his refusal to violate any provision of the act. Section 1133 provides for recovery of damages and injunctive relief.

Section 1134 defines (a) "hot cargo" as "any combination or agreement resulting in a refusal by employees to handle goods or to perform any services for their employer because of a dispute between some other employer and his employees or a labor organization or any combination or agreement resulting in a refusal by employers to handle goods or perform any services for another employer because of an agreement between such other employer and his employees or a labor organization"; and (b) secondary boycott as "any combination or agreement to cease performing, or to cause any employee to cease performing any services for any employer, or to cause any loss or injury to such employer, or to his employees, for the purpose of inducing or compelling such employer to refrain from doing business with, or handling the products of any other employer because of a dispute between the latter and his employees or a labor or-

ganization or any combination or agreement to cease performing, or to cause any employer to cease performing any services for another employer, or to cause any loss or injury to such other employer, or to his employees, for the purpose of inducing or compelling such other employer to refrain from doing business with, or handling the products of any other employer, because of an agreement between the latter and his employees or a labor organization.'' The remaining subdivisions of that section define labor organization, employer and employee.

Section 1135 states that the act shall be in effect until May 1, 1943, and thereafter ''(a) During the continuance of the existence of the National emergency declared by the President of the United States to exist, by his proclamation issued under date of September 8, 1939. (b) During any period of war between the United States of America and any foreign power, legally declared to exist.''

Section 1136 is a severability clause, providing that if any provision, or the application of such provision to particular persons or circumstances should be held invalid, the remainder of the act, or its application to persons or circumstances otherwise shall not be affected thereby.

There is no attack upon the findings of the court, nor upon their sufficiency to support the judgment in the contempt proceeding if the statute be deemed a valid exercise of legislative power. Since the acts (combinations and agreements) restrained and found to have been committed come within the definitions of ''hot cargo'' and ''secondary boycott'' contained in section 1134, the court is not confronted with the necessity of determining the effect of section 1132. The validity of that section is not involved under the facts in this case.

The question then is whether combinations and agreements in furtherance of ''hot cargo'' and ''secondary boycott'' operations, as defined by section 1134, may be declared unlawful by the Legislature, and legal and equitable redress afforded for and to prevent injury therefrom. The petitioner contends that that legislative power does not exist because its exercise interferes with claimed freedom of speech in connection with a ''secondary boycott,'' including peaceably conducted picketing. In other words, the petitioner invokes the constitutional guarantee of free speech as an inherent right to pursue, in union disputes with an employer, secondary

coercive measures against the employer's business, including the picketing of his carriers, suppliers and customers if peaceably conducted. But, as stated in the early case of *Pierce* v. *Stablemen's Union* (1909), 156 Cal. 70, at page 78 [103 P. 324], no sanctity attaches to a trade union which puts it above the law or which confers upon it rights not enjoyed by any other individual or association.

The alleged constitutional issue is provoked by judicial utterances that picketing is a form of free speech to be protected under constitutional guaranties. (*Senn* v. *Tile Layers' Protective Union, Local No. 5,* 301 U.S. 468 [57 S.Ct. 857, 81 L.Ed. 1229] ; *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093] ; *Carlson* v. *California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104] ; *American Fed. of Labor* v. *Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855] ; *In re Bell,* 19 Cal. 2d 488 [122 P.2d 22].) It does not follow, and the courts have not declared, that peaceful picketing may never become actionable or enjoinable.

The present statute declares tortious (with appropriate legal and equitable redress) conduct, which in the absence of statute, courts generally have held to be tortious, but which in a minority of jurisdictions the courts have, in the absence of a permissive statute, regarded as nonactionable and nonenjoinable. (See vol. 1, Teller, Labor Disputes and Collective Bargaining, §§ 123, 150 and cases cited; see, also, article, Teller, *Picketing and Free Speech,* 56 Harv. L. Rev. 180, reprinted in Teller, Labor Disputes and Collective Bargaining, April, 1947, Cumulative Supp., p. 70, tracing the emergence and history of the identification of picketing with the right of free speech.) Heretofore this court, in the absence of statute, has adopted the minority view in dealing with "secondary boycott" as a means of economic coercion in labor disputes. (*Parkinson Co.* v. *Building Trades Council, supra,* 154 Cal. 581; *Pierce* v. *Stablemen's Union, supra,* 156 Cal. 70.) But, as hereinbefore stated, this court has repeatedly and uniformly declared that such a matter was one for legislative cognizance, and that since the Legislature had not acted the courts were left without legislative guidance in the determination thereof.

Picketing for an unlawful purpose may be enjoined. (*James* v. *Marinship Corp., supra,* 25 Cal.2d 721; *Bautista* v. *Jones,* 25 Cal.2d 746 [155 P.2d 343] ; *Park & T. I. Corp.* v. *International etc. Teamsters, supra,* 27 Cal.2d 599.)

Although generally, in the absence of statute, the court may not define the boundaries of an industrial dispute, the Legislature unquestionably has the power in the interests of the public welfare to prescribe reasonable limits upon the use of economic weapons by either side in industrial controversy. In *In re Porterfield,* 28 Cal.2d 91, at 101 [168 P. 2d 706, 167 A.L.R. 675], it was definitely recognized that the constitutionally protected right of free speech is not an absolute right; that the right does not carry with it into the conduct of businesses and professions total immunity from regulation in the performance of acts as to which speech is a mere incident or a means of accomplishment; and that a right to speak for the purpose of profit may not be indulged in derogation of the police power of the state.

This court in approving "secondary boycott" or other coercive measures as lawful union activities has repeatedly recognized the legislative power to change the policy of the state. This is evidenced by the following quotations from our decisions:

"[A]nd as with regard to other questions of economic or political aspect, the remedy, if a remedy is needed, must be found by the legislature." (*Parkinson Co.* v. *Building Trades Council, supra,* 154 Cal. 581, 599.) And at page 610, per Sloss, J. concurring, "But if there be, in such combinations, evils which should be redressed, the remedy is to be sought, as to some extent it has been sought, by legislation. If the conditions require new laws, those laws should be made by the law-making power, not by the courts."

"It may very well be that combination and organization on one side or the other places in the hands of a few persons an immense power which, in the general welfare, ought to be limited and controlled. But these are considerations for the law-making power, not for courts." (*C. S. Smith Met. Market Co.* v. *Lyons, supra,* 16 Cal.2d 389, 400.) And at page 403, "The fear that they [labor unions] have grown so strong as to endanger vital civil liberties and disrupt the functioning of our economic system is an argument exclusively for the consideration of the legislature."

"The basis for equity's intervention in cases such as this [enjoining untruthful statements in picketing] rests upon the fact that picketing is one of the forms of collective labor activity which seeks to exert economic pressure upon an employer. (See Restatement, Torts, § 796, et seq.) . . . Such

collective labor activity is permissible only when conducted according to the requirements imposed by law, and if in violation of such requirements, picketing is subject under ordinary circumstances to the restraint of a court of equity. . . . The standards imposed for determining whether picketing is lawful and permissible, or unlawful and enjoinable, are matters of state law which have varied from time to time and from jurisdiction to jurisdiction.'' (*Magill Bros.* v. *Building Service etc. Union, supra,* 20 Cal.2d 506, 510.)

''Although recent decisions in the United States Supreme Court hold that a state cannot deprive labor unions of the right of free speech through peaceful picketing . . . these decisions do not deny a state the power to protect against abuses of the right. In two recent cases the court upheld the state's power to limit peaceful picketing both as to place and as to the economic relationship of the industry picketed (*Allen-Bradley Local No. 1111* v. *Wisconsin E. R. Board,* 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154]; *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143]). . . .'' (*James* v. *Marinship Corp.,* 25 Cal.2d 721, 729 [155 P.2d 329, 160 A.L.R. 900].) And in the same case at page 730 it was said: ''Thus a state may impose limits on picketing or other concerted action if the 'end sought' is not permissible under state law and public policy, though any such limitations are subject to review by the United States Supreme Court and will be annulled if they unreasonably interfere with labor's right to publicize the facts of a labor dispute.''

Picketing involves more than speech. This was effectively demonstrated in *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143], where the union, endeavoring to obtain employment of union carpenters and painters in the construction of a building in Houston, Texas, picketed the ''wholly unconnected'' restaurant business of the owner of the building under construction. The Supreme Court, in upholding an injunction restraining the picketing in violation of a Texas anti-trust law, said (at p. 727): ''It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But the recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Re-

striction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose.

"In forbidding such conscription of neutrals, in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the states. [Citing Teller and other writers.] We hold that the Constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants.' *Thornhill* v. *Alabama*, 310 U.S. 88, 103, 104 [60 S.Ct. 736, 84 L.Ed. 1093].

"It is not for us to assess the wisdom of the policy underlying the law of Texas. Our duty is at an end when we find that the Fourteenth Amendment does not deny her the power to enact that policy into law."

I note without extended comment other cases in which that power of the state has also been recognized, such as *Bakery & Pastry Drivers, etc.* v. *Wohl*, 315 U.S. 769, 775 [62 S.Ct. 816, 86 L.Ed. 1178] : "A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual," and at page 776, "Picketing by an organized group is more than free speech"; *Allen-Bradley Local No. 1111* v. *Wisconsin Employment Relations Board*, 315 U.S. 740 [62 S.Ct. 820, 86 L.Ed. 1154], upholding the board's order to desist from mass picketing and other acts, under the Wisconsin Employment Peace (unfair labor practices) Act, as (at p. 751) "not basically different from the common situation where a State takes steps to prevent breaches of the peace in connection with labor disputes"; *Duplex Printing Press Co.* v. *Deering*, 254 U.S. 443 [41 S.Ct. 172, 65 L.Ed. 349, 16

A.L.R. 196], recognizing the legislative power to declare the public policy in regard to restraints or combinations engaging in secondary boycott operations; *Dorchy* v. *Kansas,* 272 U.S. 306 [47 S.Ct. 86, 71 L.Ed. 248], upholding a statute of Kansas making it unlawful to conspire to induce others to quit their employment for the purpose and with the intent to hinder, delay, limit or suspend the operation of mining, and making it a felony for an officer of a labor union wilfully to use the power or influence of his office to induce another to violate the act.

In *Thomas* v. *Collins,* 323 U.S. 516, 529-530 [65 S.Ct. 315, 89 L.Ed. 430], relied on by the petitioner, it was said: ''The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. . . . That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. . . . For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger.'' That case involved what the majority considered to be the bare right to make a public address, purportedly restricted by a statute prohibiting solicitation of union membership by a labor union organizer without first obtaining an organizer's card. The ''present danger'' test may be deemed appropriate to such a situation because no more than free speech or free assembly was involved. The present case, involving something more than mere speech, is therefore not ruled by that test but is governed by the considerations dwelt upon in the Ritter's Cafe and other similar cases. For, as likewise said in the *Thomas* v. *Collins,* case, *supra,* at pages 537-538, ''When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed''; and, as Justice Douglas concurring, at pages 543-544, said: ''No one may be required to obtain a license in order to speak. But once he uses the economic power which he has over other men and their jobs to influence their action, he is doing more than exercising the freedom of speech pro-

tected by the First Amendment. This is true whether he be an employer or an employee. But as long as he does no more than speak he has the same unfettered right, no matter what side of an issue he espouses."

The statute in the present case does not cut off other practicable, effective means whereby those interested—including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute. It cannot be overemphasized that the act speaks against combinations and agreements as therein defined, and does not purport to include the activities of organized labor by direct attack and primary boycott (cf. *In re Bell, supra,* 19 Cal.2d 488), against the employer with whom a dispute is in progress. Many anti-trust and similar laws attest the constitutional power of legislatures to protect the public from acts pursuant to combination, conspiracy or agreement, which otherwise would be deemed lawful. "The great preponderance of judicial authority holds that individual blameless acts may become illegal if done in combination." (Teller, Labor Disputes and Collective Bargaining, vol. 1, pp. 37-38, and cases cited.) Thus the means essential to the securing of an informed and educated public opinion with respect to a matter of public concern are preserved and safeguarded by other modes of communication than the declared unlawful agreements and combinations. (Cf. *Thornhill* v. *Alabama, supra,* 310 U.S. 88, at pp. 103-104) ; nor does the act prohibit peaceful picketing as such (cf. *Carlson* v. *California, supra,* 310 U.S. 106; *In re Bell, supra,* 19 Cal.2d 488).

No one will deny that the right to carry on a business is a right to be protected under fundamental law. (*Duplex Printing Press Co.* v. *Deering, supra,* 254 U.S. 443, 465; *Truax* v. *Corrigan,* 257 U.S. 312, 327 [42 S.Ct. 124, 66 L.Ed. 254].) It is a right equally entitled to recognition under the law as the right of a worker to decide when and where and for what wages he will labor, and to organize with other workers for the protection of mutual interests. Those rights are correlative in the sense that neither may be carried on unbridled and without giving some heed to their effect upon the participants and upon the welfare of the community. The community has a direct and vital interest in the matter. The general principles were stated by Justice Brandeis in his dissenting opinion in *Traux* v. *Corrigan, supra* (257 U.S. at pp. 355 et seq.) in the following language : "Practically every change in the law governing the relation of employer and employee must abridge,

in some respect, the liberty or property of one of the parties—
if liberty and property be measured by the standard of the
law theretofore prevailing. If such changes are made by acts
of the Legislature, we call the modification an exercise of the
police power. And, although the change may involve inter-
ference with existing liberty and property of individuals, the
statute will not be declared a violation of the due process
clause, unless the court finds that the interference is arbitrary
or unreasonable or that, considered as a means, the measure
has no real or substantial relation of cause to a permissible
end. Nor will such changes in the law governing contests
between employer and employee be held to be violative of the
equal protection clause merely because the liberty or property
of individuals in other relations to each other (for instance,
as competitors in trade or as vendor and purchaser) would
not, under similar circumstances, be subject to like abridg-
ment. Few laws are of universal application. It is of the
nature of our law that it has dealt not with man in general,
but with him in relationships. . . . That the relation of em-
ployer and employee affords a constitutional basis for legis-
lation applicable only to persons standing in that relation has
been repeatedly held by this court. . . . Nearly all legislation
involves a weighing of public needs as against private desires,
and likewise a weighing of relative social values. Since gov-
ernment is not an exact science, prevailing public opinion con-
cerning the evils and the remedy is among the important facts
deserving consideration, particularly when the public convic-
tion is both deep-seated and widespread and has been reached
after deliberation. . . . The divergence of opinion in this dif-
ficult field of governmental action should admonish us not to
declare a rule arbitrary and unreasonable merely because we
are convinced that it is fraught with danger to the public weal,
and thus to close the door to experiment within the law."

It should not be concluded that the state lacks the power to
select for its citizens that one of the conflicting views regarding
"secondary boycott" and "hot cargo" which the Legislature
considers will best meet conditions and promote the public
welfare. As said in *Milk Wagon Drivers Union* v. *Meadow-
moor Dairies,* 312 U.S. 287, 296 [61 S.Ct. 552, 85 L.Ed. 836,
132 A.L.R. 1200], "That other states have chosen a different
path in such a situation indicates differences of social view in
a domain in which states are free to shape their local policy.
. . . (At p. 299.) Just because these industrial conflicts raise

anxious difficulties, it is most important for us not to intrude into the realm of policy-making by reading our own notions into the Constitution.''

The direction taken by the Legislature, within its power as in this case, is not a matter with which this court should interfere. The courts are not absolute architects of public policy. That function resides primarily in the Legislature, whose enactments the courts may not override except in cases of clear violation of constitutional guaranties.

The foregoing discussion demonstrates that the Legislature may constitutionally adopt ''the prevailing, and probably unanimous, policy of the states'' (*Carpenters & Joiners Union* v. *Ritter's Cafe, supra,* 315 U.S. 722, 728) when it determines that economic conditions point to the desirability of such a policy. Facts relating to the prevailing economic and social conditions and the desirability of the change in state policy to safeguard the welfare of the state, were presented to and fully considered by the Legislature. That this is so appears from the language of section 2 of the act which reads: ''This act is enacted for the purpose of preserving tranquillity among the citizens of this commonwealth and to insure during this present critical period of National emergency and intensive armament the unobstructed production and distribution of the products of our factories and fields, for the continued protection and preservation of our democratic way of life and for the general welfare of the people of this State.'' Both houses of the Legislature were so convinced of the necessity for the change that they passed the act of 1941 over the governor's veto. That the change in policy represented the will of the people of the state is demonstrated by the fact that the act was adopted by referendum vote at the November, 1942, general election, after extensive public debate on the subject. The act is therefore clearly expressive of both the legislative and the popular determination. It is within common knowledge that the stopping of businesses which furnish vital services and essential commodities is adverse to the public tranquility, health and welfare. It would be anomalous indeed to hold that the Legislature had no power to regulate such matters because a labor dispute was involved. The Constitution does not freeze the use of economic weapons in industrial warfare beyond legislative control.

The act was in effect in accordance with its terms (§ 1135) at the time of the events occurring herein and the commitment of the petitioner, and until the expiration of the declared

emergency (which may be deemed to have been July 25, 1947, when the President of the United States officially declared the termination of the wars which gave rise to the measure), prior to which the Legislature repealed section 1135 limiting the duration of the act to the war emergency and made the rest of the act permanent (Stats. 1947, p. ——, ch. 278, Sen. Bill 342). By section 2 of the repealing act it was declared: "This act is enacted for the purpose of permanently preserving tranquillity among the citizens of this State and to insure the unobstructed production and distribution of the products of our factories and fields, for the continued and permanent protection and preservation of our democratic way of life and the public peace, health, safety and general welfare of the people of this State."

According to the majority view, the California enactment and the restraining order issued pursuant thereto are "too sweeping, vague and uncertain," with the main reliance on *In re Bell, supra,* 19 Cal.2d 488. That case states familiar rules applicable to the consideration of criminal ordinances and statutes. Here we are not dealing with a criminal statute. There is no more difficulty in determining what conduct will be considered a wrong pursuant to the definitions contained in the statute (§ 1134) than is experienced in other cases involving a private actionable wrong. Difference of opinion as to whether facts amount in law to a breach of the duty or a standard set up by a statute are not infrequent. (See, for example, *Truax* v. *Corrigan, supra,* 257 U.S. 312, and *Milk Wagon Drivers' Union* v. *Meadowmoor Dairies, supra,* 312 U.S. 287, holding that violence could not be made lawful by statute and showing that disagreement may ensue as to whether facts alleged amounted to violence; *United States* v. *Hutcheson,* 312 U.S. 219 [61 S.Ct. 463, 85 L.Ed. 788], and *Hunt* v. *Crumboch,* 325 U.S. 821 [65 S.Ct. 1545, 89 L.Ed. 1954], where there was disagreement as to whether the undisputed conduct constituted a violation of the Sherman Anti-Trust Law, or came within the exception of section 20 of the Clayton Act as redefined by the Norris-LaGuardia Act.) The difficulty asserted in this case is not a proper ground for holding the act unconstitutional. The recent decision of the Supreme Court of the United States in *United States* v. *Petrillo,* [June 23, 1947], —— U.S. —— [67 S.Ct. 1538, —— L.Ed. ——], is especially noteworthy

in this connection. The defendant in that case was charged with the violation of section 506 of the Communications Act of 1934 (48 Stats. 1064, 1102, as amended), providing punishment by the imprisonment or fine of anyone who by the use of force, violence, intimidation or duress should coerce a licensee to employ persons "in excess of the number of employees needed" to perform actual services. One of the grounds of alleged unconstitutionality was that the act defined a crime in terms excessively vague. The court said: "Clearer and more precise language might have been framed by Congress to express what it meant by 'number of employees needed.' But none occurs to us, nor has any better language been suggested, effectively to carry out what appears to have been the Congressional purpose. The argument really seems to be that it is impossible for a jury or court ever to determine how many employees a business needs, and that, therefore, no statutory language could meet the problem Congress had in mind. If this argument should be accepted, the result would be that no Legislature could make it an offense for a person to compel another to hire employees, no matter how unnecessary they were, and however desirable a Legislature might consider suppression of the practice to be.

"The Constitution presents no such insuperable obstacle to legislation. We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. *Robinson* v. *United States*, 324 U.S. 282, 285, 286 [65 S.Ct. 666, 89 L.Ed. 944]. It would strain the requirement for certainty in criminal law standards too near the breaking point to say that it was impossible judicially to determine whether a person knew when he was wilfully attempting to compel another to hire unneeded employees. See *Screws* v. *United States*, 325 U.S. 91 [65 S.Ct. 1031, 89 L.Ed. 1495]; *United States* v. *Ragen*, 314 U.S. 513, 522, 524, 525 [62 S.Ct. 374, 86 L.Ed. 383]. The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible stand-

ards. The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more.''

It may be noted that by the enactment of the Labor Management Relations Act of 1947 (ch. 120, Public Law 101), including amendment of the National Labor Relations Act, the Congress has declared ''secondary boycott'' operations by concerted action to be an unfair labor practice with provisions for civil remedies. That legislation is cast in language the same in substance and effect as section 1134 here under consideration.

As stated, the statute here involved is not a criminal statute. It defines ''hot cargo'' and ''secondary boycott'' combinations and agreements in language which fits those operations as they are commonly practiced. As so defined they are declared to be actionable civil wrongs and enjoinable. In the present proceeding the trial court apparently experienced no difficulty in arriving at its findings that the petitioner with others had actually caused ''employees of suppliers, customers and carriers of the plaintiff to cease performing services'' for their employers; and had prevented such employers ''from doing any business with plaintiff or purchasing any supplies from plaintiff or carrying, shipping or receiving any freight or merchandise to or from plaintiff and his place of business.'' The court's findings and order show a clear understanding of the legislative definitions. Likewise here, as in the Petrillo case, no one has suggested how the draftsmanship of those definitions might be improved. No contention is made that the petitioner's acts, as found by the court, were not clearly embraced within the language of the definitions. There is therefore no such difficulty with the language as would prevent the administration of the act in accord with the legislative and popular intent. That intent is to prevent activities of persons in concert and combinations from bringing coercion to bear upon employees to stop work insofar as it would interfere with the rights of neutrals, that is, those who are not directly involved in the particular labor dispute. By the act the Legislature has determined, regardless of the prior declared emergency, and notwithstanding prior judicial declarations, that the carrying on of ''secondary'' operations by ''com-

binations'' of individuals as defined in section 1134 is contrary to the public interest and unlawful. In my opinion, it was within the constitutional power of the Legislature so to determine. The language of sections 1131 and 1134, the sections pertinent to the facts of this case, is certain and is readily understood. Those sections clearly and fully disclose the legislative intent and purpose to prohibit the activities which were enjoined, and there is therefore no reason at this time to resolve any question of severability arising under section 1136.

The writ should be discharged and the petitioner remanded.